Crosby Wilfredo ORANTES–HERNAN-
DEZ; Organizacion De Profesionales Y
Tecnicos Salvadorenos, Casa El Salva-
dor-Farabundo Marti; Salvadoran
American Professional Association;
Concilio Manzo; Central American Ref-
ugee Program; El Rescate; Marta Ester
Paniagua-Vides; Jose Sanchez Flores;
Dora Alicia Ayala De Castillo; Adelso
Salome Flores; Uvaldo Aguilar; Dora
Elia Estrada; Juan Francisco Perez-
Cruz; Jose Adilman Barahona; Ana
Estela Guevarra-Flores; Maria Elena
Molina; Candido Carcamo Marroquin;
Delia Elizabeth Garcia-Quintanilla;
Marta Osorio; Gloria De Flores; Jose
Eduardo Rubio; Jose Francisco Marro-
quin-Salvador; Hugo Rugamas; Refugi-
ados Uno through Cuatro, inclusive,
Plaintiffs,

v.

William French SMITH, Attorney General
of the United States; Immigration and
Naturalization Service; Alexander Haig,
Secretary of the United States Depart-
ment of State; Edward O'Connor, West-
ern Regional Commissioner, Immigra-
tion and Naturalization Service, Defend-
ants.

No. CV 82–1107–Kn.

United States District Court,
C. D. California.

June 2, 1982.

Carlos Holguin, Timothy Barker, Peter A. Schey, Thomas H. Edwards, Janette Stokely, Dan Marmalefsky, Hufstedler, Miller, Carlson & Beardsley, Linton Joaquin, Los Angeles, Cal., Marc Van Der Hout, Mariam Hayward, Redwood City, Cal., for plaintiffs.

Lauri Filppu, Eugene M. Thirolf, Jr., U. S. Dept. of Justice, Washington, D. C., for defendants.

KENYON, District Judge.

This action presents a nationwide challenge to certain practices and procedures allegedly employed by the Immigration and Naturalization Service ("INS") in the detention, processing, and removal of Salvadoran nationals who have entered the United States. Plaintiffs, on behalf of themselves and a proposed class numbering in the thousands, claim that they fled political persecution, torture and death in El Salvador in the hope of finding refuge in the United States. Instead, the record before the Court indicates that they have been met with a summary removal process, usually carried out by the INS with little or no regard for the procedural or substantive rights of aliens under United States immigration law.

By way of these motions plaintiffs sought provisional class certification and a preliminary injunction restraining the INS from, *inter alia*, (1) using coercive tactics to cause members of the class to accept "voluntary departure" to El Salvador; (2) failing to advise class members of their right to counsel, their right to apply for political asylum, and their right to a hearing prior to deportation; (3) denying detained class members the effective assistance of counsel by refusing to recognize counsel's authority to revoke voluntary departure agreements and by limiting class members' access to counsel and legal information; (4) placing detained class members into solitary confinement without first providing a hearing on the propriety of such punishment; and (5) commencing deportation hearings against any class member who requests political asylum prior to the issuance of the order to show cause which institutes the deportation process, until such person receives an adjudication of the asylum application from an INS district director.

On April 30, 1982, the Court granted the motion for provisional class certification and issued a preliminary injunction in substantially the form requested by plaintiffs.[1] Because of the need to act quickly in order to stop the summary removal of class members from the United States on a daily basis, the factual findings in the April 30, 1982 Orders were necessarily limited. Having considered the briefs, affidavits, and documentation submitted by both sides, and the argument of counsel at the April 9 and 16, 1982 hearings on this matter, the Court now finds the facts and states the conclusions of law as set forth herein.[2]

---

1. The Court denied plaintiffs' request for district director adjudication of political asylum applications prior to the commencement of deportation hearings. *See infra* Part VI-D.

2. As in the Order Dated April 30, 1982, the findings and conclusions herein are limited to the issues raised by the motion for preliminary injunction, i.e., Counts 1, 2, 3, 4, 6, and 8 of the

## I. PARTIES

The 19 named individual plaintiffs are citizens and natives of El Salvador residing within the United States who have been taken into custody by the INS and subjected to the practices and procedures described herein.[3] They bring suit on their own behalf and on behalf of all citizens and nationals of El Salvador eligible to apply for political asylum under 8 U.S.C. § 1158 who (a) have been or will be taken into custody pursuant to 8 U.S.C. § 1357 by agents of the Immigration and Naturalization Service; or (b) subsequent to June 2, 1980, requested, or will in the future request, political asylum within the United States prior to being served with an order to show cause pursuant to 8 C.F.R. § 242.1, whose applications for asylum have not or will not be presented to a district director for adjudication in accordance with 8 C.F.R. § 208.-8.

Defendant William French Smith is the duly appointed Attorney General of the United States and is charged with the administration and enforcement of all laws relating to the immigration, deportation, and naturalization of aliens. *See* 8 U.S.C. § 1103(a). All INS agents and employees act pursuant to a series of delegations of authority vested in the Attorney General.

Defendant Immigration and Naturalization Service is a federal agency within the United States Department of Justice and is responsible for enforcing the immigration and naturalization laws and for promulgating regulations and policies pursuant thereto. Defendant Edward O'Connor is the Western Regional Commissioner of the INS. He is subject to the supervision and direction of the Commissioner of the INS and is sued in his official capacity. He is responsible for directing INS operations in the Western Region, which includes the states of California, Arizona, Nevada, and Hawaii. Defendant O'Connor resides in the Central District of California.

At least some of the policies and practices complained of by the plaintiffs in each of Counts 1, 2, 3, 4, 6, and 8 have occurred in the Central District of California. No real property is involved in this action, nor do plaintiffs seek monetary damages.

## II. CONDITIONS IN EL SALVADOR

 In requesting the Court to enjoin certain practices and procedures of the INS, plaintiffs claim that they face irreparable injury in the form of removal to El Salvador if relief is denied. Plaintiffs have submitted voluminous evidence of the violent and dangerous conditions which permeate daily life in El Salvador in support of this claim.[4]

---

First Amended Complaint. To the extent, if any, that these findings and conclusions conflict with or raise any questions of interpretation regarding the Order Dated April 30, 1982, it is the intention of the Court that the findings and conclusions herein shall take precedence.

**3.** At the time the Complaint was filed all of the named plaintiffs had been released on bond except Marta Osorio, Gloria de Flores, Candido Carcamo Marroquin, and Jose Francisco Marroquin-Salvador. These plaintiffs have now been released from custody.

In addition to the individual plaintiffs the Complaint named several organizational plaintiffs which were formed to assist Salvadorans in various ways. On April 9, 1982 the Court requested additional affidavits and documentation regarding the nature of the membership in the organizations, as well as their purposes and objectives, in order to assist the Court in its determination of the proper class representatives. *See infra* notes 17–23 and accompanying text; *Black Faculty Ass'n v. San Diego Com-*

*munity College Dist.*, 664 F.2d 1153, 1156 (9th Cir. 1981). Plaintiffs have not yet submitted the requested information. Therefore, for purposes of the class certification and preliminary injunction orders discussed herein, the Court will defer any findings regarding the organizational plaintiffs.

The Complaint also names as plaintiffs Refugiados Uno through Cuatro, who assert that they desire political asylum within the United States but are unwilling to file therefor because of their fear that defendants will not maintain the confidentiality of the information submitted in support of their applications. Because the confidentiality issue is not raised by plaintiffs' motion for a preliminary injunction, the Court will defer any findings regarding these plaintiffs as well.

**4.** In a ruling from the bench issued April 9, 1982, and formalized in its Order Dated May 11, 1982, the Court denied defendants' Motion to Strike plaintiffs' exhibits concerning conditions in El Salvador. Defendants argued that

Several plaintiffs and proposed class members have related the brutal experiences which motivated their flight to the United States. For example, plaintiff Crosby Wilfredo Orantes-Hernandez gives the following account:

On Mother's Day, May 10, 1978, at about 11:30 p. m., about 25 government security soldiers of the National Guard arrived at our house. . . .

Five of the National Guard came up to the door and knocked. When no one answered they kicked the door down and entered. They asked my mother where the men were. My uncles, my brothers and I were asleep in the back but my mother refused to answer.

When my mother refused to answer their questions, they grabbed her by the hair and threw her against the wall, injuring her forehead. She fell to the floor and one of the guards stepped on her neck with his boot and hit her in the face with his rifle. . . . My sister then told the soldier that only my uncles and my brothers were in the house.

My uncles, my brothers and I were told to come out. The soldiers tied my uncles' thumbs together with cords that cut into their fingers. They began to beat them in the face with rifles. Both of my uncles were bleeding profusely. The guards also severely beat me using their fists and rifles.

When the National Guard left our house, they took my uncles. . . Two days later, their bodies turned up. Their heads were mutilated and their sexual organs cut off. Also their eyes had been gouged out.

Plaintiffs' Exhibit 13.

Another plaintiff [5] recounts the following story:

One night a group of armed men came to my grandmother's house in Santa Ana, El Salvador. They were with the Esquadron de la Muerte—a paramilitary death squad that is responsible for the massacre of hundreds of people in El Salvador. Myself and seven friends were ordered into the front of my grandmother's house. Moments later, the armed men began shooting at us. Five of my friends were killed; one of the five was a preg-

the Court could not consider any factual evidence regarding conditions in El Salvador which contradicted the findings made by the Executive Branch and the State Department. This argument is unsupported by any authority and the courts have routinely considered evidence of conditions in foreign countries. *See, e.g., McMullen v. INS,* 658 F.2d 1312, 1317 (9th Cir. 1981); *Coriolan v. INS,* 559 F.2d 993, 1004 (5th Cir. 1977); *Berdo v. INS,* 432 F.2d 824 (6th Cir. 1970). Evidence of conditions in El Salvador is relevant and material to plaintiffs' claim that they face "irreparable injury" in the form of removal to El Salvador if preliminary relief is denied. The Court cannot evaluate the seriousness of the alleged injury without reference to the challenged exhibits, as well as the exhibits submitted by the defendants. *Cf. Haitian Refugee Center v. Smith,* 676 F.2d 1023 at 1042 (5th Cir. 1982) (evidence of conditions in Haiti is admissible for limited purpose as long as court does not rule on merits of asylum claims).

The Court also denied defendants' motion to strike several of plaintiffs' exhibits for failure to comply with evidentiary rules. *See* Order Dated May 11, 1982. The strict evidentiary rules governing a trial on the merits and a motion for summary judgment under Federal Rule of Civil Procedure 56 are not applicable to a motion for a preliminary injunction under Rule 65. *See* 11 C. Wright & A. Miller, Federal Practice & Procedure § 2949, at 470–71 (1973); 7 Moore's Federal Practice ¶ 65.04[3], at 65–64 to –65 (2d ed. 1982); *Bracco v. Lackner,* 462 F.Supp. 436, 442 n.3 (N.D.Cal.1978). The Court recognizes that many of plaintiffs' exhibits contain hearsay and other impermissible matter which could not be admitted at trial. However, in addition to the need to act promptly when bringing a preliminary injunction motion, it is particularly important that the Court allow plaintiffs to present their case with whatever evidence is available to them when that evidence involves conditions in a foreign country. *See McMullen v. INS,* 658 F.2d at 1317–19. The weight to be accorded such evidence is a matter for the Court's discretion.

5. On April 5, 1982 the Court granted plaintiffs' motion for an Order allowing service of incomplete declarations and use of fictitious names. Plaintiffs requested the Order because of their fear that information regarding their experiences in El Salvador will be turned over to Salvadoran authorities by the INS and used against plaintiffs should they ever return or against family members still in El Salvador. The quoted testimony is taken from the unexpurgated exhibits filed with the Court.

nant woman—she was seventeen years old. I managed to escape death by throwing myself on the ground and acting as though I were dead; I was only wounded in the back by one of the death squad bullets. . . . The day after the attack armed men again came to my grandmother's house looking for me. They told a friend that was there to call them if they saw me. I decided to leave the country.

The evidence before the Court contains numerous accounts of a similar nature. To a great degree, these descriptions of unexplained disappearances, random violence, and retaliatory torture are corroborated by the findings of the President and the Department of State reflected in the evidence submitted by the defendants. The following excerpts from a report on El Salvador prepared by the State Department and submitted to Congress are illustrative:

Statistics on numbers of people killed as a result of El Salvador's current political violence are difficult to obtain and are unreliable. Available figures are useful principally to set trend lines. Two Salvadoran institutions, the Legal Aid Office which identifies itself with the Archbishopric, and the staff of the Central American University (UCA), maintain statistics on the number of persons murdered. Both institutions are sympathetic to anti-government forces. Their statistics often have a monthly variance numbering in the hundreds. The United States Embassy in San Salvador maintains its own count of death attributable to political violence, gleaned primarily from press reports. According to the embassy's count, there were 6,116 violent deaths during the twelve-month period ending January 1, 1982. The embassy's figures also show a decline in average monthly totals from around 800 per month in late 1980 and the beginning of 1981 to 200–400 per month at the end of the year. Some Church sources claim that perhaps twice as many non-combatants have been killed.

. . . .

a. Torture

The 1952 constitution prohibits "all forms of torture." There have been numerous reports that terrorists of both the left and the right have used torture to gain information and to intimidate their opponents. Bodies bearing clear signs of torture have been discovered. Despite constitutional bans and government policy against using torture, individual members of the security forces may have been involved in unsolved crimes of murder with torture. There have been credible accounts of torture and abuse at interrogation centers operated by the security forces, especially the treasury police, during investigations of people suspected of subversion. Some persons who have been captured by government forces have alleged that they were tortured during interrogation. Psychological torture by leftist and rightist terrorists in the form of threats against or murders of family members of prisoners has also been claimed.

. . . .

c. Disappearances

Disappearances in El Salvador are frequent and are attested by frequent petitions for information in the local press. Paramilitary or security forces personnel probably bear responsibility in a number of these cases. In the frequent habeas corpus proceedings that arise from these disappearances, however, the government forces invariably deny a connection with these disappearances. The guerrillas are also known to impress young men into their ranks by coercion. The large number of corpses, often mutilated, discovered throughout El Salvador dictates quick, on-the-spot burial. It is often impossible to identify a corpse before it must be interred. This intensifies the tragedy of the disappeared. Unidentified bodies have been discovered at isolated spots around the country, such as the El Playon lava bed outside San Salvador.

d. Arbitrary Arrest and Imprisonment

El Salvador's judicial system does not function effectively when politically mo-

tivated crimes are brought before it. Until passage of decree 507, no serious attempts were made to use the judiciary to control political violence. Judiciary staffs have themselves been the frequent targets of threats and assassination attempts. Consequently, no matter how strong the evidence against them, those of the right and left charged with crimes of violence are regularly released by intimidated courts. The incapacity of the judicial system has encouraged elements of the security forces and ordinary citizens to ignore it and to dispense their own brands of "justice."

Under normal Salvadoran law, a person can be arrested and legally held for 72 hours. Many detainees have spent a longer period awaiting trial. Most detainees are suspected members of armed leftist groups arrested during raids or routine searches for arms or propaganda. At the end of November 1981 there were a total of 381 political prisoners under detention at the Mariona, Santa Tecla and Women's Prisons. At any given time, many people—perhaps several hundreds—are detained at police detention centers around the country under state of siege regulations for periods of 72 hours to 180 days.

U.S. Dep't of State, Country Reports on Human Rights Practices for 1981, Report to the House Comm. on Foreign Affairs & Senate Comm. on Foreign Relations, 97th Cong., 2d Sess. 425–28 (Comm. Print 1982).[6]

The pervasive and arbitrary violence in El Salvador has been amply documented by international human rights organizations as well. For example, Amnesty International, a London-based organization, has concluded "that there has been a consistent pattern of killing by the security forces of peasants, young people and other victims who had no part in guerrilla activity." Letter from Amnesty International to U.S. Secretary of State Alexander Haig (May 6, 1981) (discussing possible impact of United States military assistance to El Salvador on Amnesty International concerns in that country).

█ In short, the violent conditions in El Salvador are a matter of public record and are corroborated by all available accounts. The Court therefore believes that it can take judicial notice of the following facts without having to "second guess" the Executive Branch's analysis of events in El Salvador, as feared by defendants:[7] (1) El Salvador is currently in the midst of a widespread civil war; (2) the continuing military actions by both government and insurgent forces create a substantial danger of violence to civilians residing in El Salvador; and (3) both government forces and guerrillas have been responsible for political persecution and human rights violations in the form of unexplained disappearances, arbitrary arrests, torture, and murder. See Perez-Funez v. District Director, No. CV 81–1457 (C.D.Cal. March 24, 1982).[8]

## III. INS TREATMENT OF DETAINED SALVADORANS

### A. Coerced Signing of Voluntary Departure Agreements Without Notice of Rights

The foregoing makes clear that for many Salvadorans the decision to enter the United States is one born of desperation. Yet, in many instances, the hope and expectations which they bring to the United States

---

**6.** In response to telephone inquiries regarding travel to El Salvador, the State Department has indicated that it (a) considers any travel to El Salvador to be extremely dangerous; (b) recommends that no travel there be undertaken, even on official business; and (c) cannot offer its protection to United States citizens travelling in El Salvador. Plaintiffs' Exhibit 7.

**7.** See note 4 supra.

**8.** The Court's power to take judicial notice of grave conditions in other countries where all pertinent reports disclose similar accounts is well-established. See United States ex rel. Fong Foo v. Shaughnessy, 234 F.2d 715 (2d Cir. 1955) (judicial notice of political conditions in People's Republic of China); United States ex rel. Mercer v. Esperdy, 234 F.Supp. 611, 616 (S.D.N.Y.1964) (judicial notice of political repression in Haiti); Matter of Joseph, 13 I. & N. 70, 72 (1968) (same); see generally Fed.R.Evid. 201(b).

prove to be short-lived. Under United States immigration law, plaintiffs and the class they seek to represent are eligible to apply for political asylum and to request a deportation hearing prior to their departure from the United States. *See* 8 U.S.C. §§ 1158, 1252(b), 1253(h). Nonetheless, the vast majority of Salvadorans apprehended by the INS sign voluntary departure agreements which commence a summary removal process and may result in their return to El Salvador almost immediately after their arrest.[9] The record before the Court indicates that the widespread acceptance of voluntary departure is due in large part to the coercive effect of the practices and procedures employed by the INS and the unfamiliarity of most Salvadorans with their rights under the immigration laws.

The process of securing a voluntary departure agreement begins with the initial, sometimes abusive, contact between the INS agent and the apprehended Salvadoran. Without in any way passing judgment on the conduct of INS agents in individual situations, the Court believes that consideration of the circumstances of the arrests from the arrestees' point of view is essential to an understanding of the subdued state of many Salvadorans at the time they accept voluntary departure. For example, plaintiff Crosby Wilfredo Orantes-Hernandez gives the following account of his arrest by INS agents on September 14, 1981:

> I was getting off a bus at Venice and Main in Culver City when INS agents in civilian clothing followed a companion and myself in a van. The van stopped and one man approached. My companion ran immediately but the agent grabbed me by the arm and twisted it behind my back. He threw me against the van and held me by the arms while a second agent took out his revolver and struck me very

hard in the face, twice. I began to bleed profusely from the nose and mouth. I believe they beat me because my companion ran. They shoved me in the van and took my wallet and went through it, taking out my driver's license and an ID card.

Plaintiffs' Exhibit 13.

Plaintiff Adelso Salome Flores was arrested in the following manner:

> On the 8th of December, 1981, I went out to shop and was returning to work, walking down 7th Street at Main [*sic*], when suddenly a man dressed in civilian clothes came running up to me. When I saw him, he caught me by surprise and in that instant I pulled away. But, from behind, a Black man, also dressed in civilian clothing pushed me. Together they hit me in the face and legs to make me fall, finally throwing me to the ground. One grabbed me by the arms and the other put his knees on my chest. They wouldn't say anything, so I asked them, "What happened? Who are you?" in English because I thought they didn't speak Spanish. After that they put handcuffs on me, one of them took out his badge and showed it to me. He was Immigration.

Plaintiffs' Exhibit 18. *See also* Plaintiffs' Exhibits 10, 15, 34.

Following their arrest, Salvadorans are customarily taken to INS detention facilities for "processing." During these sessions they are requested to provide biographical information and are given the opportunity to apply for voluntary departure from the United States pursuant to 8 U.S.C. § 1252(b). Although voluntary departure is only one of the alternatives available to arrested aliens, the evidence before the Court discloses a variety of techniques used

---

**9.** The INS does not break down by nationality the number of aliens who accept voluntary departure prior to the commencement of deportation proceedings. The figures compiled for all aliens apprehended during the fiscal years from 1977 through 1980 indicate that 75% were eligible for, agreed to, and were granted voluntary departure prior to the issuance of the order to show cause which begins the deporta-

tion process. *See* Defendants' Exhibit L ¶ 12. Attorney Linton Joaquin, who handles a large number of Salvadoran clients, testified before the Court and estimated that 80–90% of his clients had signed voluntary departure agreements before securing legal advice. *See* Transcript of April 9, 1982 hearing ("TR–I") at 133, 193.

by INS agents to obtain consent to voluntary departure, ranging from subtle persuasion to outright threats and misrepresentations. Further, on this record it appears that Salvadorans are rarely given any notice of their rights or any information regarding other options. Even if the Salvadorans have independent knowledge of available alternatives, the agents apparently persist in their attempts to secure voluntary departure agreements. The following account by plaintiff Dora Elia Estrada is illustrative:

> I was taken to a border patrol station in El Centro, California, where I was questioned by a border patrol agent as to the circumstances of my entry. While I was talking, I was handed a form and told to sign without any explanation of what the form said. I insisted on reading it, however, and discovered it was a form in which I was agreeing to go back voluntarily to El Salvador. I refused to sign it and said that I wanted to remain here and apply for political asylum. . . .
>
> The INS official told me that I could not get political asylum in the United States, and that I would have to remain in jail for a long period of time. Moreover, he told me that I would be placed in a cell with men, leaving me with the impression that I would be sexually molested. He did not mention to me that I had a right to place a bond to get out of custody, that I had the right to call a lawyer, or that I had the right to go before an Immigration Judge to try to ask for release on my own recognizance or have bail lowered. He also told me that [not] only [would] my political asylum application be denied, but that they would inform the authorities in El Salvador of all the information that I had given them.

Plaintiffs' Exhibit 23.

The evidence before the Court is replete with similar firsthand descriptions. Plaintiffs Marta Ester Paniagua-Vides and Juan Francisco Perez-Cruz were given voluntary departure forms by INS agents and told to sign without the slightest indication that they had any choice in the matter. Plaintiffs Maria Elena Molina, Uvaldo Aguilar, Dora Alicia Ayala de Castillo, Marta Osorio, and Gloria de Flores were told that they would remain incarcerated for long periods of time if they did not accept voluntary departure. Plaintiff Perez-Cruz was repeatedly grabbed by the collar and interrogated relentlessly until he disclosed his country of origin and signed the voluntary departure form. Plaintiff Molina asked the INS agent several times if she had any alternative to voluntary departure but received no information. Plaintiff Adelso Salome Flores asked to speak to a lawyer but was told that she would have to answer the agent's questions before making any calls. See Plaintiffs' Exhibits 12, 14, 18–19, 22, 24, 66–67; Transcript of April 9, 1982 hearing ("TR–I") at 94–96.[10]

---

**10.** The experiences of the proposed class members as set out in the numerous affidavits on file in this action are remarkably similar to the accounts of the named plaintiffs and without exception corroborate the descriptions of INS misconduct. The coercive and usually successful methods employed by the INS agents to obtain voluntary departure agreements from these Salvadorans include (1) telling Salvadorans that whether or not they sign the form they will be sent back to El Salvador, see Plaintiffs' Exhs. 15 at pages 3–5 (hereinafter, e.g., 15/3–5) (declaration of Jose Adalberto Hernandez); 58/2–3 (declaration of Numa Pompilio Mejia); 59/2 (declaration of Noe Castillo Nunez); (2) stating that the signing of the form is mandatory, usually without any description of its contents, see Plaintiffs' Exhs. 60/1 (declaration of Jorge Guillermo Argueta); 61/1–2 (declaration of Freddy Portillo Cartagena); 64/1 (declaration of Camilo Medrano-Melendez); (3) telling Salvadorans that refusal to sign the form will result in a long period of detention, see Plaintiffs' Exhs. 10/5–6 (declaration of Manuel Fiallos); 21/10–12 (declaration of Edgar Rosales Campos); 34/5–7 (declaration of Luis Renato Canjura); and/or (4) confiscating every scrap of paper carried by the detainee, including names and phone numbers of friends in the United States, see Plaintiffs' Exhibit 68 (declaration of Manuel de Jesus Viva Escobar). Attorney Antonio Bueno, who has represented hundreds of Salvadoran clients, gave the following summary of INS practices:

> The first thing [INS agents] tell [Salvadoran detainees], of course, is that they're not going to grant [political asylum] to them. It's going to be denied. They always tell them that. And then the other things they tell them is

The affidavits before the Court, as well as the position taken at the April 16, 1982 hearing by the INS Chief Counsel, reveal that the INS and its agents are particularly unwilling to divulge any information regarding the political asylum process. Under 8 U.S.C. § 1158(a) asylum may be granted to aliens who have a well-founded fear that they would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion if they returned to their country of origin. *See id.* § 1101(A)(42). Defendants freely acknowledge that INS agents as a rule do not give any notice of the existence of the asylum procedures and argue that such notice is not required. Yet even when plaintiff Jose Adilman Barahona specifically requested an opportunity to apply for asylum, he was told that asylum was not available. Plaintiffs Aguilar, Ayala de Castillo, and Paniagua-Vides told the INS agents that they feared death upon returning to El Salvador; still they were not informed of the possibility of asylum. *See* Plaintiffs' Exhibits 12, 14, 19.

The foregoing also reveals that INS agents may not allow Salvadorans to consult with retained counsel prior to signing the voluntary departure forms. Although the INS acknowledges that aliens have this right and includes notice thereof on the voluntary departure forms, Salvadorans often are not allowed to consult with counsel until *after* they have consented to voluntary departure. At the April 9, 1982 hearing counsel for defendants explained that some INS agents give the full *Miranda* warning before questioning any alien and suspend all questioning once a request for counsel is made, but others allow the alien to contact counsel only after completion of the required "processing." TR–I at 194–97.

Even those Salvadorans fortunate enough to secure legal representation may be unable to avoid voluntary departure. Defendants' present practice is to refuse to recognize the authority of counsel to stop the removal process until a formal notice of representation ("Form G–28") is filed. *See* 8 C.F.R. § 292.4 (1981). Yet the record indicates that Salvadorans are frequently arrested, deposited in waiting rooms, interrogated, put onto buses, and flown back to El Salvador all in a matter of hours. Because of the rapidity of this process, it is often physically impossible for counsel to locate their clients and file the Form G–28 before the client is removed from the country. The experience of William H. Steiner, an attorney who frequently represents Salvadorans, in attempting to stop the return of Jose Manuel Trejo highlights the dilemma posed by the Form G–28 requirement:

Immediately after receiving the . . . telephone call [from Mr. Trejo's family], I telephoned the Immigration & Naturalization Service detention facility at El Centro, California, and spoke with INS Officer Sagredo. This was at approximately 4:45 p. m., March 3, 1981. I informed Officer Sagredo that I was representing Mr. Trejo and orally advised him that Mr. Trejo was, through his counsel, withdrawing all waivers of any rights that he may have previously executed, including any waivers to a due process deportation hearing and the right to apply for political asylum. Mr. Sagredo informed me that this information would be transferred to Mr. Trejo's file and that I should mail an INS form G–28, a notice of representation of counsel, to INS Officer Rick Mathyer, Immigration & Naturalization Service, 1111 N. Imperial Avenue, El Centro, California, 92243. Officer Sagredo further indicated that "there would be no problem" with respect to an immediate deportation of Mr. Trejo and with my preparing and filing a political asylum application for him.

I immediately completed and mailed an INS form G–28 to the INS detention facility at El Centro as per the instruc-

that the bond is going to be very high and no way they could post it, and that it's a waste of money. And they paint a pretty dim picture of why they should [sign the voluntary departure form]. And each one goes through a separate interview. They all seem to sign. For some reason they all seem to sign.
Deposition of Antonio Bueno, at 83 (April 1, 1982).

tions of Officer Sagredo. At approximately 9:00 a. m. on March 5, 1981, I was telephoned by Mr. Trejo's sister who informed me that she had attempted to contact her brother in El Centro, California, on March 4, 1981, and had been advised by an INS agent that her brother was in the process of being deported to El Salvador. At approximately 9:30 a. m., March 5, 1981, I telephoned the INS detention facility at El Centro and spoke with INS Officer Malone, Supervisor of Deportation. He advised me that my client, Mr. Trejo, had been removed from the INS El Centro detention facility to Los Angeles International Airport and had been required to depart the United States to El Salvador at 6:00 p. m. on March 4, 1981. On March 6, Officer Harry F. Malone forwarded a letter to me confirming that Mr. Trejo "was returned to his country of nationality on March 4, 1981" and further stating that my notice of entry as counsel (INS form G–28) and letter withdrawing waivers previously executed by my client had been received at the El Centro detention facility on March 6, 1981. My client was removed from the United States subsequent to my notifying the Immigration & Naturalization Service of my entry into the case as counsel and while I was in the process of preparing Mr. Trejo's political asylum application.

Plaintiffs' Exhibit 30 ¶¶ 5–6; see also Plaintiffs' Exhibit 27 ¶ 4.

Even after the Form G–28 is filed, the record indicates that the INS may refuse to recognize counsel's authority to revoke voluntary departure agreements on behalf of their clients. According to attorney Jorge Gonzalez, one INS agent told him that a voluntary departure agreement is not effectively withdrawn "solely because an attorney [instructs the agent that it is to be withdrawn]. . . . [Only] when the client [makes] such [a request] would the deportations be cancelled." Plaintiffs' Exhibit 31 ¶ 6. Attorney Linton Joaquin testified that he has filed the Form G–28 only to be told that he could not revoke a voluntary departure agreement until he personally spoke with his client. TR–I at 145–47.

The supposed ability of Salvadoran detainees to revoke the voluntary departure agreements on their own does not mitigate the cumulative effect of the foregoing practices and procedures. Although the form itself states that the agreement is revocable, the failure of many Salvadorans to understand the significance of the forms has been well-documented. See supra notes 9–10 and accompanying text. Further, plaintiff Molina testified that she was not allowed to keep a copy of the form and thus had no notice of its revocability. TR–I at 128. Attorney Joaquin testified that several of his clients had tried unsuccessfully to retract their consent to voluntary departure prior to securing legal representation. Id. at 180. In any case, Salvadorans are not likely to revoke the agreements unless they somehow learn that alternatives to voluntary departure are available.

The record in this case indicates that the mistreatment of Salvadorans is not limited to any particular geographic area or to the conduct of a few INS agents. The experiences of the plaintiffs and proposed class members took place in a wide variety of locations, including California, Arizona, Texas, Oklahoma, and Massachusetts. See, e.g., Plaintiffs' Exhibits 10, 12–13, 27, 35, 58–60, 66–68, 72–73. These stories are corroborated by affidavits from persons who have spoken with hundreds of Salvadorans after their arrest and interrogation by the INS. Attorneys who frequently represent Salvadorans have confirmed that the majority of their clients had no idea that the signing of the departure forms was intended to be "voluntary." See Plaintiffs' Exhibits 27, 30, 70; TR–I at 135. The sheer volume of evidence before the Court and the similarity of the experiences therein belie the contention by defendants that plaintiffs' claims center on isolated incidents of misconduct.

Based on this record, the Court concludes that INS agents routinely give incomplete, misleading, and even false advice to Salvadorans regarding their legal rights. This

practice, coupled with the other coercive tactics set forth above, understandably can lead Salvadorans to believe that they have no alternative but to depart "voluntarily."

### B. *Conditions in INS Detention Facilities*

For Salvadorans forced to remain in the custody of the INS while awaiting deportation hearings or transportation to El Salvador, the record substantiates plaintiffs' charges of poor treatment and continued denial of legal information.[11] The evidence before the Court indicates that Salvadorans incarcerated in the INS facilities in Pasadena, Los Angeles, Chula Vista, and El Centro are prohibited from receiving or possessing any written materials, with the exception of the New Testament of the Bible. *See* Defendants' Exhibit K ¶¶ 19–21 (declaration of Harry F. Malone); Plaintiffs' Exhibit 54 ¶ 4 (declaration of Jorge Gonzalez); TR–I at 154 (testimony of Linton Joaquin). Packets of written materials explaining the legal rights of aliens are routinely confiscated. *See* Plaintiffs' Exhibits 16, 28, 32. Defendants claim that such restrictions are necessary because of the danger of fire and the likelihood that written materials will be used to clog toilets and other drains. *See* Defendants' Exhibit K ¶¶ 20–21.

Incarcerated Salvadorans may receive visitors only during limited hours. Visiting hours at the Los Angeles and Pasadena facilities are, respectively, 8:00 a. m. to 6:00 p. m. and 10:00 a. m. to 7:00 p. m. *See* Defendants' Exhibit J ¶ 9. At the El Centro facility, visiting is allowed between the hours of 8:00 a. m. and 4:00 p. m. *See* Defendants' Exhibit K ¶ 10. Because of the distance of the El Centro facility from Los Angeles, attorneys travelling to El Centro are frequently unable to complete their interviews with class members in the time available. *See* Plaintiffs' Exhibit 32. Defendants contend that the hours must be restricted because of the lack of space and the limited staff.

Incarcerated Salvadorans also experience great difficulty in obtaining access to telephones at these facilities. The Court heard uncontradicted testimony that the Chula Vista facility has no telephones available for the use of detainees. TR–I at 142. At the Los Angeles and Pasadena facilities, five and two public telephones, respectively, are available. At the El Centro facility, defendants at one time provided only two public telephones but have represented to the Court that six additional telephones will be installed in the near future. *See* Defendants' Exhibit K ¶ 16.

On a nationwide basis defendants have adopted a policy that paralegals working under the supervision of counsel may not interview detainees unless the attorney is present. *See id.* ¶ 11; Defendants' Exhibit J ¶ 9; Plaintiffs' Exhibit 56 ¶ 5 (declaration of Jorge Gonzalez). This policy severely hampers the ability of attorneys to provide legal services. *See id.*

In addition to limiting access to legal information and counsel, defendants' current guidelines allow Salvadoran detainees to be placed in solitary confinement without notice or an opportunity to be heard. Defendants' Exhibit K ¶ 18. This policy may result in the indiscriminate imposition of punishment, as illustrated by the experience of plaintiff Jose Sanchez-Flores:

> Conditions at the El Centro facility are severe. We are not given any clothing while in the camp, and we are subject to being punished without a prior hearing for little or no reason. I have been placed in "La Loba"—a cell where prisoners are placed for solitary confinement—on three different occasions. Once I was placed in solitary confinement for four days, and on two other occasions I spent three days in solitary confinement. I was punished in this way for not staying in my place in the long line that forms at meal time, for throwing a piece of soap on the roof of one of the barracks, and for playing with a friend. I was never

---

11. Plaintiffs challenge a wide range of practices allegedly employed at INS detention facilities across the country. However, with regard to many of these challenges, the evidence present-ed by plaintiffs is limited to facilities in the Central and Southern Districts of California, and the Court's findings will be limited accordingly.

given a hearing regarding whether I should be punished so severely for such minor acts.

Plaintiffs' Exhibit 16; *see also* Plaintiffs' Exhibit 11 at 4.

## C. *Conclusion*

With some exceptions, the above findings are taken almost exclusively from the declarations and other evidence presented by plaintiffs, which defendants have left largely uncontested. Instead, defendants have focused their energy on the legal questions raised by plaintiffs' claims, urging the Court to step carefully because of the sensitivity of many of these issues. The Court recognizes both the need for care and restraint and the need to act quickly to put an end to the practices just described. It is with these concerns in mind that the Court has considered and resolved the following legal issues.

## IV. JURISDICTION AND VENUE

At the outset of this litigation defendants moved to dismiss several causes of action for lack of subject matter jurisdiction. In a ruling issued from the bench on April 9, 1982, and formalized in its Order Dated May 11, 1982, the Court denied defendants' motion in its entirety. The reasoning behind the Court's conclusions that jurisdiction is proper over all causes of action will be set out in an abbreviated fashion here and will include only the causes of action put in issue by the preliminary injunction motion.

In asserting the Court's lack of jurisdiction, defendants argue that plaintiffs may challenge the alleged deprivations of their right to apply for asylum [12] and their right to the effective assistance of counsel [13] only in deportation hearings before an immigration judge. Should deportation orders be issued, defendants contend that plaintiffs must first exhaust the administrative review procedures provided by INS regulations, *see* 8 U.S.C. § 1105a(c), and then seek judicial review only in a court of appeals pursuant to 8 U.S.C. § 1105a.

Defendants misinterpret the parameters of the exhaustion and exclusive jurisdiction provisions. Section 1105a vests the appellate courts with exclusive jurisdiction over all matters incident to a final order of deportation and requires the party seeking review to exhaust the administrative remedies provided by the immigration laws and regulations before bringing suit. Section 1105a does not apply, however, to denials of discretionary relief by the Immigration and Naturalization Service or to other claims unrelated to a final order of deportation, and jurisdiction over these matters remains with the district courts. *See, e.g., INS v. Stanisic*, 395 U.S. 62, 68 n.6, 89 S.Ct. 1519, 1523 n.6, 23 L.Ed.2d 101 (1969); *Cheng Fan Kwok v. INS*, 392 U.S. 206, 212, 88 S.Ct. 1970, 1974, 20 L.Ed.2d 1037 (1968); *Lai Haw Wong v. INS*, 474 F.2d 739, 742 (9th Cir. 1973); 8 U.S.C. § 1329. Because plaintiffs' challenges relate to procedures employed by the INS prior to the commencement of deportation hearings, these challenges can and must be brought in a district court. *See Fleurinor v. INS*, 585 F.2d 129, 136 n.6 (5th Cir. 1978); *Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442, 457–61 (S.D.Fla.1980), *aff'd as modified*, 676 F.2d 1023 at 1033–36 (5th Cir. 1982).

Further, to require plaintiffs to raise their claims in deportation hearings would effectively ensure that some plaintiffs never raise these claims at all. Because of the voluntary departure process, many of the proposed class members will return to El Salvador without ever participating in deportation hearings. It is well-settled that exhaustion will not be required when the administrative remedies are inadequate. *See, e.g., NLRB v. Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 426 n.8, 88 S.Ct. 1717, 1722 n.8, 20 L.Ed.2d 706 (1968). Administrative remedies are of

---

**12.** Counts 2 and 8 of the First Amended Complaint.

**13.** Count 3 of the First Amended Complaint.

no avail to those plaintiffs who will never enter the deportation process.[14]

Defendants argue additionally that this Court lacks jurisdiction over plaintiffs' claim that they are entitled to notice of the right to apply for political asylum because of the political question doctrine. Defendants claim that a finding in plaintiffs' favor would encourage asylum applications and would amount to a foreign policy determination which should be made only by Congress or the Executive Branch.

■ This argument fails for two reasons. First, a finding that notice of the asylum process is required in no way amounts to a determination that Salvadorans should be *granted* asylum or even that they should receive special consideration because of the civil war in El Salvador. Second, although the Court recognizes the great deference owed to Congress and the President in the immigration field, the deference owed the INS is more circumscribed. The Court clearly has the power to determine whether the INS is complying with the laws and Constitution of the United States and whether it is depriving Salvadorans of their rights to due process, as alleged by the plaintiffs in this case. *See Hampton v.*

*Mow Sun Wong,* 426 U.S. 88, 101–03, 96 S.Ct. 1895, 1904–05, 48 L.Ed.2d 495 (1976); *Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950); *Illinois Migrant Council v. Pilliod,* 540 F.2d 1062, 1068 n.5, *modified,* 548 F.2d 715 (7th Cir. 1976); *Haitian Refugee Center v. Civiletti,* 503 F.Supp. at 470–73. The Court agrees with the defendants that it has no constitutional authority to determine the nation's foreign policy, but, by the same token, the Court cannot constitutionally avoid its duty to hear due process challenges to governmental action simply because those challenges touch on foreign relations. *Cf. Chadha v. INS,* 634 F.2d 408, 419 (9th Cir. 1980), *cert. granted,* 454 U.S. 812, 102 S.Ct. 87, 70 L.Ed.2d 80 (1981) (court considered immigrant's claim that statute violated separation of powers doctrine); *Olejario v. United States,* 629 F.2d 204 (2d Cir. 1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981) (political question doctrine did not bar jurisdiction of claim by naturalization applicant that executive branch had violated Congress' intent to grant citizenship to certain Filipino nationals); *see generally Baker v. Carr,* 369 U.S. 186, 211–13, 82 S.Ct. 691, 706–07, 7 L.Ed.2d 663 (1962).[15]

**14.** Even if all plaintiffs did pursue the administrative process, the Court fails to see how the administrative remedies urged by defendants could result in the relief sought here. Plaintiffs are not challenging their individual eligibility to avoid deportation or to receive political asylum. Instead, they are challenging the entire system for processing Salvadorans taken into custody by the INS as statutorily and constitutionally defective. Although pursuit of the administrative process might result in the granting of asylum or the withholding of deportation to a particular plaintiff, the alleged procedural deficiencies in the pre-hearing treatment of Salvadorans would remain uncorrected. *See also Haitian Refugee Center v. Smith,* 676 F.2d 1023 at 1033–36 (5th Cir. May 24, 1982) (drawing distinction between appellate court's jurisdiction over merits of individual deportation order and district court's power to rule on pattern and practice of constitutional violations).

Because of the inadequacy of the suggested administrative remedies, this case is distinguishable from the decision in *Louis v. Meissner,* 532 F.Supp. 881 (S.D.Fla.1982). In *Louis* the court held that it lacked jurisdiction to review various policies and procedures em-

ployed by the INS in exclusion proceedings involving Haitians. The court was of the opinion that the issues raised would "merge" into the final orders of exclusion and could be reviewed on appeal to the Board of Immigration Appeals. *Id.* at 888. The court found no reason to believe that the administrative remedies would be inadequate or ineffective. *Id.* at n.8.

**15.** Defendants also moved to dismiss the Complaint to the extent that it is based on the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, on the ground that the Protocol is not self-executing. The Court need not decide the merits of this argument because plaintiffs do not rely on the Protocol as the exclusive basis for any of their causes of action. Whether or not the Protocol is self-executing, plaintiffs are clearly entitled to rely on it as persuasive authority and to urge the Court to construe the Refugee Act of 1980, Pub.L. 96–212, 94 Stat. 102 (1980), consistently with the Protocol's provisions. *See* S.Rep.No.256, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 144; *Coriolan v. INS,* 559 F.2d 993, 997 & n.8 (5th Cir. 1977); *Haitian Refugee Center v.*

The Court therefore concludes that it has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1331 and 8 U.S.C. § 1329.[16] Venue is properly laid over all causes of action pursuant to 28 U.S.C. § 1391(b) & (e)(1), (2).

## V. MOTION FOR PROVISIONAL CLASS CERTIFICATION

Pursuant to Federal Rule of Civil Procedure 23(b)(2), plaintiffs move this Court for a provisional certification of the following classes of persons:

> All citizens and nationals of El Salvador eligible to apply for political asylum under 8 U.S.C. § 1158 who (a) have been or will be taken into custody pursuant to 8 U.S.C. § 1357 by agents of the Immigration and Naturalization Service; or (b) subsequent to June 2, 1980, requested, or will in the future request, political asylum within the United States prior to being served with an order to show cause pursuant to 8 C.F.R. § 242.1, whose applications for asylum have not or will not be presented to a district director for adjudication in accordance with 8 C.F.R. § 208.-8.

### A. *Membership in an Identifiable Class*

■ In determining whether class certification is proper, the Court must consider, first, whether plaintiffs seek to represent an identifiable class, and, second, whether the named plaintiffs themselves are members of that class. *See* 3B Moore's Federal Practice ¶ 23.04 (1982).

The Court is satisfied that the first requirement is met here. The proposed class is neither too vague nor overly broad. Although subparts (a) and (b) of the definition may overlap, such overlap is necessary in order to create two classes concerned with different issues. *See* 7A Wright and Miller, Federal Practice and Procedure § 1790 (1972).

■ Similarly, any overlap with two other recently filed class actions, *Nunez v. Boldin*, No. B–81–311 (S.D.Tex.), and *Perez-Funez v. District Director*, No. 81–1457 (C.D. Cal.), is necessary because of the nationwide scope of the relief sought in this action. The defendants' objection that nationwide relief is inappropriate because they do not single out Salvadorans for poor treatment is in reality an attempt to interject the merits of plaintiffs' claim into the decision of whether a class should be certified. Where the class is defined by reference to the defendants' alleged nationwide practices, nationwide certification is proper. *See* 1 Newberg on Class Actions § 2094, at 597 (1977); *Metropolitan Area Housing Alliance v. United States Department of Housing and Urban Development*, 69 F.R.D. 633, 638–39 (N.D.Ill.1976). *Cf. Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, *modified*, 548 F.2d 715 (7th Cir. 1976) (certifying statewide class based on defendants' alleged practices).

■ The Court is also satisfied that at least some plaintiffs are members of the class they seek to represent with regard to each claim for relief in the proposed preliminary injunction.[17] The requirement that plaintiffs be members of the class is simply another way of stating that the named plaintiffs must have standing to bring the action and must present an ongoing case or controversy before they may represent the interests of others. *See* 1 Newberg on Class Actions §§ 1040, 1072a, 1080b (1977). The standing question arises because of the claims made by the named plaintiffs in Counts 1 (use of coercive tactics to secure

---

*Smith*, 676 F.2d at 1038 & n.35. *See also McMullen v. INS*, 658 F.2d 1312, 1319 (9th Cir. 1981) (citing Handbook on procedure under Protocol as persuasive authority).

16. *See Haitian Refugee Center v. Smith*, 676 F.2d at 1033 & n.22. The standing of the named plaintiffs to bring this action is discussed *infra* notes 17–23 and accompanying text.

17. The Court's inquiry into standing and the Order Granting Provisional Class Certification will be limited to the specific claims for relief raised in the proposed preliminary injunction, which are based on Counts 1, 2, 3, 4, 6, and 8 of the First Amended Complaint.

voluntary departure agreements), 2 (failure to advise of right to apply for political asylum), and 8 (failure to allow district director adjudication of asylum applications prior to commencement of deportation hearings) of the First Amended Complaint.[18] Most of the named plaintiffs therein had been released from custody and had revoked their voluntary departure forms at the time this action was filed. Hence defendants contend that the claims of these plaintiffs were resolved before the filing of the Complaint and urge that judicial review is no longer necessary.

The difficulty in this area is not whether the named plaintiffs have standing in the sense that that term is used to refer to "injury-in-fact," because the Complaint clearly discloses the occurrence of such injury. Nor can it seriously be argued that the asserted injuries are not within the "zone of interests" protected by the statutes and constitutional rights on which plaintiffs' claims are based. *See Data Processing Service v. Camp,* 397 U.S. 150, 153–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). Instead, the Court must decide whether plaintiffs' claims are sufficiently "ripe," i.e., whether they face a threat of future injury sufficient to justify judicial intervention, and/or whether plaintiffs' claims have become "moot," i.e., whether the need for such intervention continues and whether plaintiffs retain the necessary personal stake in the outcome of the litigation.

The issues of standing, ripeness, and mootness are often so intertwined that complete disentanglement is impossible. *See Warth v. Seldin,* 422 U.S. 490, 499 n.10, 95 S.Ct. 2197, 2205 n.10, 45 L.Ed.2d 343 (1975); *Lyons v. City of Los Angeles,* 615 F.2d 1243, 1246 & n.5 (9th Cir.), *cert. denied,* 449 U.S.

934, 101 S.Ct. 333, 66 L.Ed.2d 158 (1980), *aff'g preliminary injunction,* 656 F.2d 417 (9th Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 1426, 71 L.Ed.2d 647 (1982). However, because each doctrine addresses itself to specific and legitimate concerns which are present in this action, separate treatment is warranted.

*1. Ripeness.*

To the extent that the named plaintiffs in Counts 1, 2, and 8 seek prospective injunctive relief to enjoin conduct which they have been subjected to in the past, plaintiffs must show that their claims are "ripe" for such relief; in other words, they must demonstrate the possibility of "real and immediate future injury." *See Rizzo v. Goode,* 423 U.S. 362, 372, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976); *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974). Under a strict interpretation of *Rizzo* and *O'Shea,* plaintiffs could not meet this requirement because the alleged injuries have already been inflicted and plaintiffs will not be subject to the challenged practices in the future unless they prevail in their deportation hearings and are again detained by INS agents.

However, the Ninth Circuit's recent decision in *Lyons v. City of Los Angeles, supra,* eschews a rigid application of the principles in *Rizzo* and *O'Shea* and requires the Court to look at the specific facts of the case before it. Plaintiffs here are challenging the widespread use of coercive tactics by the INS to obtain voluntary departure agreements, coupled with the alleged failure to provide adequate notice of rights. Both sides agree that hundreds of Salvadorans are arrested, processed, and returned to El Salvador each month. The alleged

---

18. The standing of the named plaintiffs in Counts 3 (failure to allow effective assistance of counsel), 4 (prohibition against receipt and possession of written materials) and 6 (punishment without opportunity to be heard) is readily apparent and need not be discussed at great length here. Plaintiffs Marta Osorio, Gloria de Flores, Candido Carcamo Marroquin, and Jose Francisco Marroquin-Salvador were all in defendants' custody at the time this action was filed and presented a live case or controversy

with regard to the various effective assistance of counsel claims raised in Count 3. *See* Complaint ¶¶ 43, 45, 50. Plaintiffs Candido Carcamo Marroquin and Jose Francisco Marroquin-Salvador presented a live case or controversy with regard to Counts 4 and 6. The subsequent release of these plaintiffs did not moot their claims. *See infra* text accompanying note 23.

For a fuller discussion of the standing issue, see this Court's Order Dated April 30, 1982 (granting provisional class certification).

practices of the defendants, if true, not only facilitate the rapid processing of Salvadorans but also make it virtually impossible for prospective plaintiffs to remain in this country long enough to bring suit. Hence the Court cannot reasonably refuse to hear plaintiffs' charges by vague reliance on the principles of judicial restraint. *See Illinois Migrant Council v. Pilliod, supra; Lankford v. Gelston*, 364 F.2d 197 (4th Cir. 1966). *See generally Loya v. INS*, 583 F.2d 1110, 1114 (9th Cir. 1978) (court notes that it would be inclined to enjoin future misconduct by the INS in using dragnet tactics to pick up illegal aliens "giving due consideration to the prudential limitations on the exercise of the court's power to grant equitable relief."). In this situation, as in *Lyons*, the named plaintiffs may again be detained and subjected to the challenged practices. Moreover, "the threat of future injury to not only [the named plaintiffs] but to every [Salvadoran] in the [country] is much more immediate" than the speculative injury in *Rizzo* and *O'Shea*. *See Lyons*, 615 F.2d at 1246.[19] The Court therefore concludes that the claims presented by plaintiffs for injunctive relief are ripe for judicial review.[20]

## 2. Mootness.

Regardless of whether plaintiffs face a recurrent injury as required for a "ripe" case or controversy, the Court believes that their past injury has not become moot through the revocation of the voluntary departure agreements and that plaintiffs maintain the necessary personal stake in the outcome of the litigation. Clearly these plaintiffs "once had a live and active claim meeting all the Article III requirements even under *O'Shea* and *Rizzo*, if only for a period that lasted but a few [hours]." *Lyons*, 615 F.2d at 1248. But these claims are of the type which is "capable of repetition, yet evading review." *Id.* at 1249–50. If the anatomy of a voluntary departure is truly as plaintiffs allege, that is, if Salvadorans are coerced into signing voluntary departure forms which result in the waiver of their right to a deportation hearing and are given no notice of the opportunity to apply for political asylum, then it is painfully obvious that the majority of proper plaintiffs will be unable to bring suit because they will have "voluntarily departed" from this country. The remaining possible plaintiffs will have revoked their voluntary departure forms and entered the deportation process. If mootness is as strictly applied as defendants suggest, these plaintiffs will no longer present an injury which must be redressed. This untenable situation, coupled with the continuing adverse conse-

**19.** As in *Lyons*, this case is also distinguishable from *Rizzo* and *O'Shea* because the plaintiffs do not seek federal intervention into and supervision of the conduct of state institutions and officials. *See Lyons*, 615 F.2d at 1247 & n.6. Federal courts have historically provided forums wherein challenges to established federal procedures on due process grounds can be raised. *See, e.g., Hampton v. Mow Sun Wong*, 426 U.S. 88, 98–99, 96 S.Ct. 1895, 1903, 48 L.Ed.2d 495 (1976). Plaintiffs' challenge to allegedly widespread practices by the INS which are indisputably illegal, such as the use of coercive tactics to obtain consent to voluntary departure without a hearing, is also an appropriate area for intervention by a federal court *if* a "pattern and practice" is shown. *See generally Loya v. INS*, 583 F.2d 1110, 1114 (9th Cir. 1978).

**20.** Plaintiffs have clearly shown a sufficiently ripe case or controversy for purposes of securing the declaratory judgment requested in the First Amended Complaint. *See Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 125–26, 94 S.Ct. 1694, 1699–1700, 40 L.Ed.2d 1 (1974); *Powell v. McCormack*, 395 U.S. 486, 496–99, 89 S.Ct. 1944, 1950–52, 23 L.Ed.2d 491 (1969); *Vallejo v. Sureck*, No. CV 78–1912 (C.D.Cal. December 27, 1978). The named plaintiffs continue to suffer the consequences of the challenged pre-hearing treatment by the INS because they have been placed in deportation proceedings without the chance to apply to a district director for asylum and, allegedly, without ever having had the opportunity to make an informed decision regarding voluntary departure at government expense. As aptly stated by the court in *Haitian Refugee Center v. Civiletti*, 503 F.Supp. at 466, "it would be incredible to contend that the plaintiffs are no longer suffering the effects of the defendants' alleged misconduct" where their deportability is still at issue. Most of the named plaintiffs are currently undergoing hearings which may result in their immediate return to a country where they may face death or other serious harm.

quences with which the named plaintiffs are saddled,[21] compels the conclusion that their claims for relief are not moot and that they retain membership in the class of persons which they seek to represent. *See id.* at 1249 n.11; 13 Wright & Miller, Federal Practice and Procedure § 3533, at 275, 285 (1975).[22]

In sum, the Court finds that each named plaintiff in Counts 1, 2 and 8 has standing and has presented a live case or controversy based on one or both of the following premises: (a) the named plaintiff has suffered past injury and faces a threat of recurrent injury; and (b) the named plaintiff had a live case or controversy for only a few hours which is "capable of repetition, yet evading review" because no plaintiff could ever pursue these claims if an exception to the mootness doctrine is not employed.

Alternatively, the Court finds that plaintiffs Marta Osorio and Gloria de Flores, who at the time this action was filed were in defendants' custody and had executed "voluntary" departure forms which had not been revoked and pursuant to which they were about to be returned to El Salvador, presented a live case or controversy at the time this action was filed with regard to Counts 1, 2, and 8. These plaintiffs there-

fore had standing to seek *some* form of injunctive relief, although not necessarily the broad injunctive relief available once a class is certified. *See generally Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.,* 522 F.2d 1235, 1238 (7th Cir. 1975), *modified,* 538 F.2d 164, *cert. denied,* 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). Although these plaintiffs have now revoked their voluntary departure agreements and have applied for political asylum, they may nonetheless seek class certification with regard to these issues because their claims are "capable of repetition, yet evading review." *United States Parole Commission v. Geraghty,* 445 U.S. 388, 400–07, 100 S.Ct. 1202, 1210–14, 63 L.Ed.2d 479 (1980); *Gerstein v. Pugh,* 420 U.S. 103, 110 n.11, 95 S.Ct. 854, 861 n.11, 43 L.Ed.2d 54 (1975); *Sosna v. Iowa,* 419 U.S. 393, 402 n.11, 95 S.Ct. 553, 558 n.11, 42 L.Ed.2d 532 (1975). Because these plaintiffs are still subject to and intimately involved with INS procedures as applied to Salvadorans, the "imperatives" of "sharply presented issues in a concrete factual setting and self-interested parties vigorously advocating opposing positions" are satisfied. *See Geraghty,* 445 U.S. at 403, 100 S.Ct. at 1211.[23] The certification of

---

**21.** *See* note 20 *supra.* Because of these continuing consequences plaintiffs retain the "personal stake in the outcome of the litigation" necessary to ensure proper representation of the class. *See* note 23 *infra* and accompanying text.

**22.** Counsel for defendants suggested at oral argument that a proper plaintiff could be found through the use of intervention. *See United Airlines v. MacDonald,* 432 U.S. 385, 393–95, 97 S.Ct. 2464, 2469–70, 53 L.Ed.2d 423 (1977). Again defendants ignore the exigencies of the situation which they have created. Defendants do not dispute that an alien may be removed from the United States within 24 hours after being taken into custody. Further, defendants' own regulations require that the decision whether to institute deportation proceedings against a particular alien be made within 24 hours after arrest. *See* 8 C.F.R. § 287.3 (1981). The Court therefore agrees with counsel for plaintiffs that it is not humanly possible to find a "live" plaintiff, file the appropriate intervention papers, *and* obtain a Temporary Restraining Order stopping that person's departure or preventing the commencement of deportation proceedings in such a short period of time.

**23.** The Supreme Court in *Geraghty* and the cases preceding it did not create an exception to the mootness doctrine applicable to every case. Although these decisions allow the Court to determine the propriety of class certification after the named plaintiffs' claims have expired where the claims are necessarily of short duration, the Court must still consider whether these plaintiffs are appropriate class representatives. *See Geraghty,* 445 U.S. at 405–07, 100 S.Ct. at 1212–13.

Defendants argue that plaintiffs Osorio and de Flores are not proper class representatives because the injuries they allege in Count 1 did not occur. *See* Defendants' Exhs. P, Q. But the affidavits of these plaintiffs directly contradict defendants' assertions and raise factual issues with regard to Count 1 which cannot be resolved fully at this juncture. *See* Plaintiffs' Exhs. 66–67. Whether or not defendants agree with these plaintiffs' allegations, the plaintiffs themselves are clearly interested in prosecuting these claims and believe that they have suffered past injuries with continuing consequences. With regard to Counts 2 and 8, defendants concede that they engage in the alleged practices and limit their argument to the

the class ensures that the requisite adversity between the parties will continue. *Sosna v. Iowa*, 419 U.S. at 402, 95 S.Ct. at 558.

## B. *Requirements of Rule 23(a)*

■ In order to be certified for class treatment, plaintiffs must demonstrate that the four requirements of Federal Rule of Civil Procedure 23(a) have been satisfied. The Court finds that plaintiffs have met their burden.

### 1. *Numerosity and Impracticality of Joinder.*

■ The proposed class is so numerous that joinder is clearly impractical. The parameters of the class change on a daily basis as Salvadorans are apprehended and removed from the United States. Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied. *See* 1 Newberg on Class Actions § 2094, at 596 (1977).

### 2. *Common Questions of Law or Fact.*

Rule 23(a)(2) requires a showing of questions of law or fact common to the class. The declarations on file in this action allege a pattern or practice of INS conduct affecting hundreds of Salvadorans each month. Common questions of fact presented by these declarations include whether the INS routinely coerces Salvadorans into waiving their right to a deportation hearing prior to being removed from the United States; whether the INS deprives Salvadorans of their right to seek political asylum from a district director by refusing to comply with requests to apply for asylum until after an order to show cause is issued; whether the INS refuses to allow Salvadoran detainees the effective assistance of counsel by disregarding counsel's attempts to withdraw agreements to voluntarily depart executed by detained clients; whether the INS fails to provide sufficient telephone facilities for incarcerated Salvadorans; whether incarcerated Salvadorans are placed into solitary confinement without first being provided a hearing on the propriety of such punishment; whether the INS unlawfully precludes incarcerated Salvadorans from receiving written materials, particularly materials explaining their rights under United States immigration law.

Common questions of law include whether the INS is required to advise Salvadorans of their right to apply for political asylum; whether the INS violates Salvadorans' right to counsel by refusing to recognize counsel's authority to withdraw voluntary departure agreements; whether incarcerated Salvadorans are entitled to receive written materials, including materials explaining their rights under United States immigration law; whether incarcerated Salvadorans are precluded from gaining access to the courts and counsel because of limited telephone facilities; whether incarcerated Salvadorans are entitled to notice of the charges and an opportunity to be heard before being placed into solitary confinement; whether persons who indicate a desire to apply for political asylum prior to the issuance of an order to show cause are entitled to district director consideration of their asylum applications.

Defendants argue that, notwithstanding the existence of these questions, class certification is inappropriate because factual questions unique to each individual plaintiff predominate and require "subjective" determinations rather than classwide treatment. Although defendants are correct in pointing out that each plaintiff's claim to asylum and each plaintiff's deportability must be determined individually, such individual claims are not presented in this case. Plaintiffs' challenge to the legality of admitted INS procedures and their claim that certain practices are applied to the class as a whole clearly do present common questions. Consequently, "it makes no difference that a variety of specific activities are complained of or constitutional violations are alleged." *Alliance to End Repression v. Rochford*, 565 F.2d 975, 979 (7th Cir. 1977).

contention that these practices are not unlawful. Defendants' argument that these plaintiffs are not proper class representatives is therefore without merit.

### 3. *Typicality of Claims.*

The typicality requirement of Rule 23(a)(2) is satisfied here by the showing of common questions of law or fact as well as the division of the representative plaintiffs into appropriate subclasses where the particular claim for relief is not sought by all of the named plaintiffs. *See Bacon v. Toia,* 437 F.Supp. 1371, 1381 (S.D.N.Y.1977), *aff'd,* 580 F.2d 1044 (2d Cir. 1978). Defendants argue that the named plaintiffs in each claim for relief have not presented "typical" claims because the INS has no policy of treating Salvadoran aliens in the manner suggested by plaintiffs. These arguments are more properly addressed to the merits of plaintiffs' claims and have no relevance to the *typicality* of the allegations.

The Court is at a loss to understand defendants' additional argument that the possible and perhaps even probable desire of many Salvadorans to exit the United States pursuant to voluntary departure agreements, rather than through the deportation process, somehow precludes a finding of typicality. Nowhere in the Complaint or in their moving papers do plaintiffs contend to the contrary, and plaintiffs' challenges to the administrative process will not prevent any class member from so departing.

### 4. *Adequacy of Representation.*

Rule 23(a)(4) requires a showing that the named plaintiffs "will fairly and adequately protect the interests of the class." This subsection of the rule is directed primarily at ensuring that the named plaintiffs' interests are not antagonistic to the interests of the absent class members and that the named plaintiffs have retained competent counsel. Defendants do not seriously object to the competency of plaintiffs' counsel and the Court has no doubts, based on the experience of counsel in the immigration law field and their commitment to representing the Salvadorans, that the representation requirement in that sense is satisfied.

Defendants do object, however, to representation of absent class members by these particular plaintiffs, arguing in essence that they overzealously seek relief and reforms which absent class members may not want or need. Again, defendants raise the spectre of an end to all voluntary departure agreements, as well as a tedious administrative process which may require Salvadorans to spend even more time in INS detention facilities. The Court fails to see how the allegations and claims for relief in this case could possibly lead to such results. Without exception, plaintiffs' claims are directed at the procedures for handling Salvadoran aliens prior to removal from the United States or commencement of deportation hearings. Should the Court decide that the procedures challenged by plaintiffs do not conform to minimum due process requirements, such a decision clearly would not amount to a Draconian edict that absent class members *must* exercise their due process rights and undergo deportation hearings. Due process carries with it the notions of choice and intelligent waiver, and the Court does not read plaintiffs' claims as an attempt to impose anything on absent class members other than the opportunity to make a knowing and informed decision regarding voluntary departure.

### C. *Propriety of Classwide Injunctive Relief*

This action meets the requirement of Rule 23(b)(2) that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Plaintiffs are challenging various procedures and practices of the INS which, they allege, are based on grounds generally applicable to Salvadoran aliens. Plaintiffs are not required to show that these procedures and practices have been employed with respect to each class member. Nor is it relevant, as defendants have argued throughout, "that some members of the class are personally satisfied" with the challenged actions. 3B Moore's Federal Practice ¶ 23.04[2], at 290 (1982). The issues presented in this case are best resolved by an injunctive decree of classwide scope.

The Court therefore concludes that plaintiffs have fully satisfied the requirements of Federal Rule of Civil Procedure 23 and that provisional class certification is proper.[24]

## VI. MOTION FOR PRELIMINARY INJUNCTION

In this Circuit the Court may apply either of two tests in determining whether to issue a preliminary injunction. The traditional test requires a showing that:

(1) The plaintiffs will suffer irreparable injury if injunctive relief is not granted; (2) the plaintiffs have a strong likelihood of prevailing on the merits; (3) the balance of hardships favors the plaintiffs; and (4) granting the injunction is in the public interest.

*William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 87 (9th Cir. 1975). Alternatively, plaintiffs may prevail upon a showing (1) that serious questions are raised, and (2) that the balance of hardships tips sharply in their favor. *Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1134 (9th Cir. 1979). To the extent that plaintiffs seek "mandatory" rather than "prohibitive" relief, they must clearly establish that a change in the status quo is warranted. *See Larry P. v. Riles*, 502 F.2d 963, 965 (9th Cir. 1974).

### A. *Coerced Signing of Voluntary Departure Agreements*

In seeking a preliminary injunction against INS coercion, plaintiffs submit that they face irreparable injury in the form of removal to El Salvador if relief is denied. The Court agrees.

The Court has taken judicial notice of the violent conditions prevailing in El Salvador. Clearly, removal to a country overrun with civil war and violence may lead to an injury which is irreparable in the most literal sense of the word.

The question therefore is not the seriousness of the injury alleged by plaintiffs, but the relation of that injury to the defend-ants' conduct and the certainty that it will occur if a preliminary injunction is not issued. Defendants point out that they are not responsible for the acts of Salvadoran authorities or the violence in El Salvador. However, defendants must observe the Salvadorans' due process rights when implementing the voluntary departure provisions of 8 U.S.C. § 1252(b) and must take the responsibility for any return of class members to El Salvador in violation of due process. *See Wong Yang Sung v. McGrath*, 339 U.S. 33, 49, 70 S.Ct. 445, 453, 94 L.Ed. 616 (1950) ("constitutional requirement of procedural due process . . . permeates every valid enactment" of Congress).

Defendants argue further that plaintiff class members do not face *immediate* irreparable injury because they can raise their claims in deportation hearings if the preliminary injunction is denied. This argument necessarily ignores the crux of the injury alleged: The class members will never reach the deportation process if they are coerced into signing voluntary departure forms without notice of the opportunity to apply for asylum and without realizing that they have a right to deportation hearings. This dilemma compels the finding that plaintiff class members may face irreparable injury if relief is denied.

Turning to the merits of this claim, plaintiffs' success depends on their ability to demonstrate a "pattern or practice" of coercive conduct rather than "isolated incidents." *Compare Allee v. Medrano*, 416 U.S. 802, 815–16, 94 S.Ct. 2191, 2200–01, 40 L.Ed.2d 566 (1974) (police who set out to crush union organizing effort engaged in "persistent pattern" of intimidation) *with Rizzo v. Goode*, 423 U.S. 362, 363, 373–77, 96 S.Ct. 598, 605–07, 46 L.Ed.2d 561 (1976) (20 incidents of police misconduct in handling citizen complaints do not constitute a "pervasive pattern of intimidation" as required for injunctive relief).

Coercion is a word capable of many meanings, and it is important to understand

---

**24.** The class representatives and sub-classes were set out in Part IV of the Court's Order Dated April 30, 1982, which is attached hereto as Appendix A.

the context in which plaintiffs' claims arise. The evidence before the Court establishes that Salvadorans are often frightened and confused at the time of their arrest and interrogation by the INS.[25] In some cases the aliens do not understand the language in which they are addressed, much less the chain of events which has been set in motion. In this environment, "coercion" is not limited to physical force or outright threats. The courts on numerous occasions have recognized that the more subtle effects of atmosphere, setting, and the omission of certain statements or advice may have an equally coercive effect. *See, e.g., Miranda v. Arizona,* 384 U.S. 436, 448, 86 S.Ct. 1602, 1614, 16 L.Ed.2d 694 (1966) ("Coercion can be mental as well as physical, and the blood of the accused is not the only hallmark of an unconstitutional inquisition.").

It is precisely the effects of the interrogative environment and the omissions in the information provided by INS agents which defendants fail to address adequately in their response. Defendants strenuously contend that any form of coercion violates INS regulations and that any agent found using coercive tactics would face disciplinary proceedings. Also, defendants have submitted evidence raising factual questions with regard to two of the named plaintiffs' experiences. Further, defendants argue that the allegations reflect only a small number of incidents relative to the large number of Salvadorans apprehended each year. *See* Defendants' Exhibit G ¶ 11 (estimating that 1,524 Salvadorans were apprehended during the 1980 calendar year in the El Centro area alone).[26]

Yet defendants fail to contest plaintiffs' descriptions of the conduct of the agent in the field. At oral argument Chief

Counsel for the INS reminded the Court that the agency is powerless to completely control its employees. Even more telling, in response to the evidence that INS agents supply certain facts and notices at the voluntary departure stage while omitting others, defendants argue that such conduct is not illegal. According to defendants, INS agents who inform Salvadorans that they will not be released on bail pending deportation hearings or adjudication of their asylum applications, who suggest that their applications for political asylum will be denied anyway, and who note that families may be separated during the hearing process, are simply giving "accurate descriptions" of what may in fact occur. In the context already described, however, and without any offsetting notice of rights, such "accurate descriptions" are improper. Counsel for the INS argued that it is only fair to give these people the "down" side of their situation; yet to give only this perspective and, as seen in the declarations, to deny any knowledge of an "up" side, i.e., of possible alternatives to voluntary departure, constitutes coercion.

Based on the voluminous evidence adduced by plaintiffs and the limited response of the defendants, the Court finds that plaintiffs have a strong likelihood of success on the merits of the coercion charge. Plaintiffs "have shown a specific pattern of conduct, akin to an explicit policy." *Illinois Migrant Council v. Pilliod,* 540 F.2d 1062, 1067, *modified,* 548 F.2d 715 (7th Cir. 1976); *see also Zepeda v. INS,* No. CV 79–3955 (C.D.Cal. April 15, 1980). The effect of this pattern and practice is to deny plaintiff class members their constitutional and statutory right to a deportation hearing. *See Wong Yang Sung v. McGrath,* 339 U.S. 33,

**25.** Indeed, at oral argument Chief Counsel for the INS pointed out that many aliens are arrested immediately after their arrival in the United States. Counsel spelled out the less-than-optimal conditions which a trip over the border may entail, e.g., hiding out under the floorboards of a car. He noted that the aliens are often disoriented and intimidated upon finding themselves confronted by a uniformed agent at the end of their journey who often

speaks no Spanish. The interrogations typically follow close on the heels of this experience in surroundings which the Chief Counsel himself described as "coercive in nature."

**26.** Plaintiffs cannot be required to submit affidavits from every apprehended Salvadoran in the country. The evidence before the Court demonstrates that the practices challenged by plaintiffs are widespread.

70 S.Ct. 445, 94 L.Ed. 616 (1950); 8 U.S.C. § 1252(b); 8 C.F.R. Part 242 (1981).[27]

■ Because the requested relief is prohibitive, it imposes little, if any, hardship on the defendants. *See Illinois Migrant Council v. Pilliod*, 540 F.2d at 1068–69. Any hardship which does exist is outweighed by the risks which plaintiff class members assume simply by returning to El Salvador and the irreversibility of a voluntary departure agreement once it has been implemented. Further, granting injunctive relief is in the public interest insofar as the order secures compliance with the laws and Constitution of the United States by the Immigration Service. Plaintiffs have therefore met the requirements in both *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., supra,* and *Miss Universe, Inc. v. Flesher, supra,* and a preliminary injunction against the further use of practices and procedures having a coercive effect is warranted.

**B.** *Notice of Right to Apply for Political Asylum*

Plaintiffs contend that the Refugee Act of 1980 requires the INS to notify class members of their right to apply for political asylum before requesting them to sign voluntary departure forms. Further, plaintiffs argue that by signing the voluntary departure forms they are effectively waiving both the right to apply for asylum and the right to a deportation hearing. Plaintiffs urge the Court to require a notice of rights in order to ensure that the waiver is knowingly and intelligently made and to mitigate the coercive effect of the INS interrogations.

For the reasons set forth above, plaintiffs have demonstrated that they face irreparable injury in the form of removal to El Salvador if relief is denied.

**1.** *The Refugee Act of 1980.*

In March of 1980 Congress enacted a bill setting forth a comprehensive system for resettlement of and assistance to refugees in the United States. Refugee Act of 1980, Pub.L.96–212, 94 Stat. 102 (1980). In the Preamble to the Act, Congress declared that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." Congress directed the Attorney General to "establish a procedure for an alien physically present in the United States . . . to apply for asylum." 8 U.S.C. § 1158(a). Eligibility for political asylum requires a showing that the alien "is unable or unwilling to avail himself or herself of the protection of [the country of origin] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(A)(42).

The congressional desire to provide assistance to deserving refugees is apparent throughout the Act.[28] In passing the asylum provisions Congress placed no limitation on the number of persons who may be granted asylum in any given year. Further, although the granting of asylum is discretionary, Congress noted its intent to bring the definition of "refugee" under United States immigration law into conformity with the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, to which the

---

**27.** Voluntary departure in lieu of a deportation hearing is of course permissible but only when the alien voluntarily, knowingly, and intelligently waives the right to a hearing. *See Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); *cf. Attoh v. INS*, 606 F.2d 1273, 1277 (D.C.Cir.1979) (waiver of right to 2-week preparation time prior to deportation hearing must be knowing and voluntary); *Navia-Duran v. INS*, 568 F.2d 803, 810 (1st Cir. 1977) (use of coerced statements to establish deportability violates due process);

*Hernandez v. Casillas*, 520 F.Supp. 389 at 393 (S.D.Tex.1981) (waiver of right to exclusion hearing must be made before immigration judge in order to ensure voluntariness).

**28.** *See* Note, *The Right of Asylum Under United States Law*, 80 Colum.L.Rev. 1125, 1131–32 (1980) ("Prompted by humanitarian concerns, the passage of the new [Refugee] Act reflects a desire to liberalize United States asylum laws and to give fuller effect to the purposes as well as the language of the Protocol.").

United States became a party in 1968. *See* S.Rep.No.256, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 144 (hereinafter S.Rep.). The Protocol prohibits the expulsion of aliens who meet the criteria set forth in 8 U.S.C. § 1101(A)(42).[29]

Moreover, under current INS regulations, an application for political asylum made after the institution of deportation proceedings is also treated and considered as a request for "withholding of deportation" under 8 U.S.C. § 1253(h). *See* 8 C.F.R. § 208.3(b) (1981). Congress in the Refugee Act specifically amended the "withholding of deportation" provision to prohibit the deportation of any alien "if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h). Hence the withholding of deportation is not a matter of discretion; if the alien satisfies the statutory criteria for eligibility, withholding of deportation must be granted. *McMullen v. INS*, 658 F.2d 1312, 1316 (9th Cir. 1981).

It is clear from sections 1158 and 1253(h) and the legislative history of the Act that Congress has "manifested its intention of hearing the pleas of aliens who come to this country claiming a fear of being persecuted in their homelands. The intention is not necessarily stated as granting the privilege of asylum to all who come to this country, but of hearing those pleas." *Nunez v. Boldin*, No. B–81–311, slip. op. at 9 (S.D.Tex. April 6, 1982); *see also Haitian Refugee Center v. Smith*, 676 F.2d at 1038–39.

Because the Refugee Act specifically confers the right to *apply* for political asylum, the Court is compelled to reject defendants' argument that notice of that right is not required. Defendants submit that notice *cannot* be required because Congress could have included a notice provision in the Act but chose not to do so. At oral argument Chief Counsel for the INS noted that Congress is aware of the Immigration Service's failure to give notice but has not passed proposed bills which would impose a notice requirement.

Congress' failure to include a notice provision cannot be interpreted as a prohibition against notice. Nor can the Court "draw [any] inference from incomplete steps in the legislative process." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 47, 70 S.Ct. 445, 452, 94 L.Ed. 616 (1950). Under defendants' interpretation, Congress intended to make asylum available only to those fortunate enough to be familiar with the intricacies of United States immigration law. Were this the case, Congress surely would not have placed so much emphasis on the need for a uniform, nondiscriminatory treatment of refugees. *See* S.Rep., *supra*, at 1–2, U.S. Code Cong. & Admin.News 1980, p. 141. Further, "the bill establishes an asylum provision ... *for the first time* by improving and clarifying the procedures for determining asylum claims filed by aliens who are physically present in the United States." *Id.* at 9, U.S.Code Cong. & Admin.News 1980, p. 149 (emphasis added). The creation of the new procedures, the reaffirmation of a policy of welcoming "persons subject to persecution in their homelands," and the renewed adherence to the United Nations Protocol all become meaningless if those intended to benefit by the asylum provision are never informed of its existence. *See Nunez v. Boldin, slip. op.* at 9.

Assuming that aliens have a right to apply for asylum and that some form of notice is required, defendants argue that current INS procedures provide an adequate oppor-

**29.** Article 33 of the Protocol provides:

1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

2. The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.

tunity to apply for asylum, reminding the Court that Congress specifically delegated the authority to implement the asylum provision to the Attorney General and urging a limited scope of judicial review. Under current procedures, an alien may apply to the district director for asylum prior to the issuance of the order to show cause instituting deportation proceedings. *See* 8 C.F.R. § 208.3 (1981). After service of an order to show cause, the application must be filed with the immigration judge. *Id.* § 208.1. The order to show cause brings with it the procedural protections of the right to counsel and the right to remain silent. If during the deportation hearing it becomes apparent that the alien may be entitled to apply for some form of relief from deportation, INS regulations require the immigration judge to inform the alien of that eligibility. *Id.* § 242.17(a).

■ Simply stated, none of these procedures and protections is of any use to the class member who departs voluntarily without ever hearing that asylum might be available. The procedures effectively frustrate the intent behind the Refugee Act by limiting the asylum process to those who undergo deportation proceedings. The broad discretion and authority given the Attorney General to devise appropriate procedures "does not include the right to nullify legislative acts or ignore statutory directives." *Olegario v. United States*, 629 F.2d 204, 224 (2d Cir. 1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). *See Labor Board v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965).

■ In finding that these procedures provide inadequate notice of the right to apply for asylum, the Court, far from encroaching on the power reserved to the Executive Branch, is simply enforcing the law as Congress wrote it. Congress passed

the Refugee Act to rectify the discriminatory treatment of refugees under then-existing immigration law and to give "statutory meaning to our national commitment to human rights and humanitarian concerns." S.Rep., *supra*, at 1, U.S.Code Cong. & Admin.News 1980, p. 141. "It is the plain duty of the courts, regardless of their views of the wisdom or policy of the Act, to construe . . . remedial legislation to eliminate, so far as the text permits, the practices it condemns." *Wong Yang Sung v. McGrath*, 339 U.S. at 45, 70 S.Ct. at 451–52 (holding that Administrative Procedure Act required deportation hearings even though current INS regulations did not). In keeping with this duty the Court can only conclude that defendants' present regulations fail to comply with the intent behind the Refugee Act and that notice of the right to apply for asylum is required.

2. *Waiver of Rights Without Notice.*

■ As an additional ground for imposing a notice requirement, the Court agrees with plaintiffs that principles of due process and fundamental fairness require the INS to advise class members of their rights before requesting them to voluntarily depart. If class members do not know of their right to apply for asylum, and if they face the coercive situation described above, they will obviously be more inclined to sign voluntary departure forms. Because of the speed with which aliens may find themselves on board a plane bound for El Salvador, the act of signing effectively puts in motion a summary departure process. For aliens unfamiliar with their rights, stopping that process is difficult at best. The signing is thus tantamount to a waiver of the right to apply for asylum as well as the right to a deportation hearing.[30]

It is undisputed that a waiver of rights must be knowingly and intelligently made,

---

**30.** The voluntary departure form states that the signer retains the right to ask for a deportation hearing at any time before departure. However, the record indicates that class members are not always allowed to keep copies of the forms. Moreover, even if the alien realizes that a deportation hearing is available, that realiza-

tion alone does not suggest that there are any grounds for avoiding deportation, such as a well-founded fear of persecution. The alien whose status is clearly illegal may well believe that nothing is to be gained from a deportation hearing.

especially where one's life or liberty is at stake. *See Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1022–23, 82 L.Ed. 1461 (1938). Abandonment of a federal right must be intentional; it will not be presumed. *In re Gault*, 387 U.S. 1, 42, 87 S.Ct. 1428, 1451, 18 L.Ed.2d 527 (1967). Although deportation proceedings are civil in nature, the stakes for a Salvadoran at the pre-hearing stage are more akin to those in the criminal process—the alien who voluntarily departs to El Salvador faces very real threats to life and liberty.[31] *See supra* Part II. The possibility, indeed probability, that most of the plaintiff class members have entered this country illegally does not negate the need for an examination of the validity of the waiver of rights. *See Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to [the] constitutional protection [of the Due Process Clause]"). The Refugee Act specifically confers the right to apply for asylum to all aliens "irrespective of such alien's status." 8 U.S.C. § 1158(a).

Applying these standards to the present case, it appears to the Court that the failure to advise Salvadorans of their right to apply for asylum and their right to a deportation hearing renders the waiver of those rights invalid under the due process clause of the fifth amendment.[32] In order to execute valid and informed waivers in the form of voluntary departure agreements, Salvadorans must receive notice of the rights which they could otherwise assert.

Additionally, the evidence that the voluntary departure agreements are often obtained in coercive circumstances supports a remedy in the form of a notice of rights. Chief Counsel for the INS acknowledged to the Court the difficulties of controlling the overworked agent in the field and of compelling obedience to executive directives or even court orders regarding the rights of aliens. The Chief Counsel further pointed out that the interrogative atmosphere is so coercive that any notices may have little effect. In order to mitigate the coercive effect of this environment, the Court in the exercise of its broad remedial powers believes that a mandatory notice of rights is appropriate. *Cf. Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976) (upholding metropolitan area remedy where Department of Housing and Urban Development had violated Constitution and federal statutes); *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–98, 66 S.Ct. 1086, 1088–89, 90 L.Ed. 1332 (1946) (grant of jurisdiction to district courts to enforce Emergency Price Control Act of 1942 allows court to order restitution of excessive rents as remedy for violation). "A court is not limited to simply prohibiting action in viola-

31. For purposes of applying the presumption against waiver, the civil character of deportation proceedings makes no difference. *See Fuentes v. Shevin*, 407 U.S. 67, 72 n.5, 92 S.Ct. 1983, 1990 n.5, 32 L.Ed.2d 556 (1972); *Ohio Bell Telephone Co. v. Public Utilities Comm'n*, 301 U.S. 292, 307, 57 S.Ct. 724, 731, 81 L.Ed. 1093 (1937). In both civil and criminal proceedings, waiver will be found only where there is "an intentional relinquishment or abandonment of a known right or privilege." *See Groves v. Prickett*, 420 F.2d 1119, 1125 (9th Cir. 1970); *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023.

32. It is well-settled that the right to a deportation hearing is of constitutional scope because deportation "involves issues basic to human liberty and happiness and, in the present upheavals in lands to which aliens may be returned perhaps to life itself." *Wong Yang Sung v. McGrath*, 339 U.S. at 50, 70 S.Ct. at 454. To knowingly waive this fundamental right Salvadorans must be informed not only of its existence but also of the possibility of asylum. *See* notes 27, 30 *supra*. Moreover, statutory rights such as the right to apply for asylum are also protected from unknowing waivers. For example, in *Baker v. Laird*, 316 F.Supp. 1 (N.D.Cal.1970), the court refused to find a waiver of a conscientious objector's right to apply for discharge from the Army. The right to apply stemmed from Army regulations setting forth the appropriate time for discharge requests. The petitioner had failed to seek a writ of habeas corpus immediately after his induction because of a mistaken belief that a former application was still under consideration and that a second application could be made later. In rejecting the Government's argument of waiver, the court stated: "Waiver occurs only when the party deliberately intends to forego a legal right he is aware of and fully comprehends." *Id.* at 6; *see also Hernandez v. Casillas*, 520 F.Supp. at 392–393.

tion of a statute, but may also require affirmative acts to be taken to assure compliance." *United States v. City of Chicago*, 549 F.2d 415, 441–42 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

Based on the clear intent behind the Refugee Act, the due process principles governing a waiver of federal rights,[33] and the evidence of defendants' coercive practices, the Court concludes that plaintiffs have demonstrated a strong likelihood of success on the merits of their claim that they are entitled to notice of the right to apply for asylum.

### 3. *Propriety of Injunctive Relief.*

As noted above, under the traditional test for preliminary relief plaintiffs must demonstrate that the balance of hardships "tips" in their favor and that granting the injunction is in the public interest. Because of the mandatory nature of the relief sought and defendants' strenuous objections to this particular claim, the Court has given extensive consideration to these elements of the injunction tests.

Arguing that both the balance of hardships and the public interest require a decision in their favor, defendants have repeatedly stressed the burden which a notice requirement would impose on the INS, not due to the actual giving of notice but rather to the effect that such notice would have. Chief Counsel for the INS represented that the agency would come to a "grinding halt" if a notice requirement were imposed. Faced with an ever-increasing backlog of

**33.** At this juncture the Court need not reach plaintiffs' additional due process argument for a notice of rights. Plaintiffs contend that the Refugee Act confers a statutorily protected interest in asylum because applicants who meet the eligibility requirements are guaranteed that their requests will be granted. Were such a protected interest found, plaintiffs could not be deprived of it without due process, and the Court would have to balance the various interests at stake to determine the specific dictates of due process in this situation. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 332–35, 96 S.Ct. 893, 901–03, 47 L.Ed.2d 18 (1976); *Geneva Towers Tenants' Organization v. Federated Mortgage Investors*, 504 F.2d 483, 488–89 (9th Cir. 1974). Yet, even if plaintiffs' characterization of the asylum process is true as a practical matter, *see Matter of Dunar*, 14 I. & N. 310, 322 (1973), the language of the asylum statute leaves the final determination on eligibility to the Attorney General's discretion. *Compare* 8 U.S.C. § 1158(a) *with id.* § 1253(h) *and McMullen v. INS*, 658 F.2d 1312 (9th Cir. 1981). However, at least one court has held that where INS regulations create the right to *apply* for asylum, the INS may not take that right away without some form of due process under *Mathews v. Eldridge, supra. See Haitian Refugee Center v. Smith*, 676 F.2d at 1039–41. In *Mathews* the Supreme Court laid out the specific factors to be considered in determining what due process requires in a particular situation, including the private interest to be affected by the official action; the likelihood of governmental error through the use of established procedures; the probable value of additional safeguards; and the governmental interest at stake, including the fiscal and administrative burdens entailed by the additional procedural safeguards. 424 U.S. at 335, 96 S.Ct. at 903.

The *Haitian* court found that the "plaintiffs certainly have an interest in proving their entitlement to political asylum under the conditions set by the Protocol and in rebutting the State Department's general conclusion that Haitians are primarily economic refugees. In addition, the risk that the INS will make an erroneous asylum determination under the procedures used here is unacceptably high." 676 F.2d at 1040. The court rejected the INS' claim that the government interest in making rapid determinations of asylum eligibility should override the other factors, concluding that "it is also in the government interest to make informed determinations." *Id.*

Although it is not necessary to employ this form of due process analysis to reach the conclusion that notice of the asylum process is required, the Court believes that similar conclusions would be warranted here. The right to apply for asylum found by the *Haitian* court rested solely on INS regulations; here, the right is even more firmly established by the Refugee Act of 1980. Further, the *Haitian* court, while leaving the precise content of the procedures required by due process up to the INS, concluded that the plaintiffs were at least entitled to present their claims "at a meaningful time and in a meaningful manner." *Id.* at 1039. The court held "that the government violates the fundamental fairness which is the essence of due process when it creates a right to petition and then makes the exercise of that right utterly impossible." *Id.* at 1039. Clearly the failure to even apprise Salvadorans of the asylum process, let alone to provide each potential asylum applicant with a hearing, does not conform to minimum due process requirements.

asylum applications from aliens of several nationalities, the agency fears that the proposed notice would encourage even more applications and would exhaust its already strained resources.[34] Further, because of the predicted need to divert INS resources to handling the additional claims, the Chief Counsel argued that the agency will be unable to fulfill its function of protecting the borders. Counsel urged the Court to consider the public interest in limiting the inflow of aliens who will take jobs from American citizens and lay claim to limited social services.

The Court appreciates that the notice requirement will lead to more asylum claims, many of which may be frivolous and many of which may require the INS to house aliens for a longer period of time. But the Court's sympathy for defendants' position is lessened somewhat by a closer examination of the asylum process. The agency's current backlog is in large part the result of a "bottleneck" which occurs when each claim is sent to the State Department for review. Under INS regulations it appears that even patently frivolous applications are sent to the State Department without prior screen-

ing. *See* 8 C.F.R. § 208.7 (1981); Defendants' Exhibit M. At the present time, only three full-time State Department employees and four consultants are handling the thousands of applications. *Id.* ¶ 3.

Given the obvious shortcomings of this process, it is clear that the congressional directive that the Attorney General establish a procedure enabling aliens to apply for asylum has not received full compliance.[35] It is up to the agencies to formulate an efficient method for processing applications in keeping with the congressional mandate, either by adding employees or by revising the asylum procedures, rather than pointing to the inefficiencies as a justification for avoiding that mandate. In the event that the agencies do not have the wherewithal to support such a system, their remedy lies with Congress. *See Wong Yang Sung v. McGrath*, 339 U.S. at 46–47, 70 S.Ct. at 452; *Hernandez v. Casillas*, 520 F.Supp. at 393 (S.D.Tex.1981).[36]

Turning to defendants' additional objections, the Court is keenly aware of the serious problems already caused by the influx of illegal aliens into the United States

**34.** At oral argument, defendants presented statistics which the Court has accepted as valid for purposes of giving full credence to their argument. Asylum claims have increased from 2529 in fiscal 1977 to 63,202 in fiscal 1981. The yearly amount of applications processed by the agency has gone up from 1900 to 4529 during the same period. The agency currently has 102,544 unadjudicated claims pending. *See also* Defendants' Exhibit M ¶ 3.

**35.** The practice of seeking State Department review of asylum applications has been employed on a regular basis since 1963 and has been incorporated into INS regulations. *See* 8 C.F.R. § 208.7. Though approved by the courts and upheld against procedural challenges, this review is not required by the Refugee Act. The final responsibility for evaluating persecution claims lies with the Attorney General, not the Secretary of State. *See* 1A C. Gordon & H. Rosenfield, Immigration Law and Procedure § 5.16b (1981). A proper analysis of this practice might well reveal that the majority of asylum applications could be disposed of swiftly, leaving only politically sensitive or otherwise problematical applications for State Department review. *Cf. Haitian Refugee Center v. Smith*, 676 F.2d at 1029 n.11, 1040 & n.47 (where administrative burden in processing

large number of cases is chiefly a problem of the INS' own making, court rejects argument that any change in INS system for processing Haitians would be unduly burdensome).

**36.** In *Haitian Refugee Center v. Smith*, the Fifth Circuit rejected a similar argument by the INS. Holding that the rapid scheduling of asylum interviews with Haitian applicants did not provide sufficient opportunity for the Haitians to present their claims, the court stated:

> The degree of extra burden imposed by requiring, at a minimum, adherence to established procedures is minimal. Any administrative burden caused by slowing the entire process to allow sufficient time to avoid multiple scheduling conflicts and to accord opportunity for full presentation of individual cases cannot alone tip the constitutional balance in favor of the government scheme actually pursued in this case.

Id. at 1040. *Cf. Bounds v. Smith*, 430 U.S. 817, 825, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977) (where fundamental right of access to courts requires prison authorities to provide legal counsel or law libraries, "the cost of protecting a constitutional right cannot justify its total denial.").

and recognizes the dangers to both citizens and illegal immigrants arising from this situation. The problems, often neglected in the past, have become even more acute in recent years. The need for creative and principled solutions in this area is all too apparent.

Be that as it may, these problems must not and surely need not be solved by depriving people of their rights. By raising these issues, no matter how real and important, defendants mischaracterize this part of the relief sought and shift the focus from equally pressing concerns. In finding that notice of the right to apply for political asylum is required both by the Refugee Act and the due process principles governing a waiver of rights, the Court is not directing that the doors be opened to illegal aliens with no right to be in this country. The Court believes and Congress has stated that those aliens with claims of persecution in their homeland should at least be heard and that those with valid claims should receive protection. In so mandating Congress has reaffirmed "one of the oldest themes in America's history—welcoming homeless refugees to our shores." S.Rep., *supra*, at 1, U.S.Code Cong. & Admin.News 1980, p. 141. A decision that would effectively exclude Salvadorans from the asylum process would make a mockery of this tradition and indeed of this country's beginnings.

In these circumstances the Court believes that preliminary injunctive relief is justified. Weighing the balance of hardships, the Court finds that the scales tip sharply and decisively in favor of plaintiffs.[37] Further, not only have plaintiffs

raised serious questions going to the merits of this claim, they have also demonstrated a strong likelihood of success on the merits, thereby satisfying both tests for injunctive relief. In addition, the public interest in providing assistance to those who face persecution in their homelands favors court intervention.

Although the mandatory form of relief sought here is traditionally disfavored, the Court may enter such an order where necessary to preserve the status quo. In one sense, the status quo in this case changes daily as Salvadorans are apprehended and transported back to El Salvador. The Court's Order will change that status quo to the extent that some class members may be less willing to voluntarily depart. On the other hand, the Order is necessary to preserve the status quo for those class members presently in this country who would not be willing to voluntarily depart if given the opportunity to make an informed decision. For these people, no later form of compensation could be adequate because of the incurably final effect of a waiver which leads to "voluntary" departure.

## C. *Right to Representation by Retained Counsel*

Plaintiffs seek an order requiring defendants to notify class members of their right to consult with retained counsel prior to signing voluntary departure forms, and to allow counsel to enter an oral appearance for and speak on behalf of a client who has signed a voluntary departure form. For the reasons set forth above, plaintiffs have

---

**37.** Defendants attempt to minimize the harm to plaintiff class members with the sweeping argument that a notice requirement "would serve no useful purpose" and that the overwhelming majority of Salvadoran asylum claims are frivolous. *See* Defendants' Exh. L ¶¶ 22–23. Defendants' statistics on Salvadoran claims are inconclusive because of the large number of claims still pending as well as the failure to keep detailed records on Salvadoran claims prior to March 1, 1981. The available data indicates that during a 9-month period, seven applications were granted and 265 denied. At the end of that period, 8,385 applications were pending. *See* Defendants' Exh. N ¶ 4. Al-

though based on this record the individual applicant's chance of receiving asylum is slim, it is certainly fair to say that for every one person in 38 who may receive asylum, denial of the opportunity to apply creates a hardship of the most serious order.

Moreover, it is this prejudgment of the claims based on nationality which Congress specifically intended to eliminate by passing the Refugee Act. *See* 1 C. Gordon & H. Rosenfield, *supra*, § 2.24Ab. The decision on asylum applications must be made separately with regard to each individual applicant. *See Haitian Refugee Center v. Civiletti*, 503 F.Supp. at 511–29; *Nunez v. Boldin*, slip op. at 15.

demonstrated that they face irreparable injury in the form of removal to El Salvador if relief is denied.

### 1. Right to Consult With Counsel Prior to Signing Voluntary Departure Agreements.

The INS concedes that aliens have the right to consult with retained counsel prior to agreeing to voluntary departure, and the voluntary departure forms presently used by defendants contain a notice of this right. *See* Defendants' Exhibit G.[38] However, the evidence submitted by plaintiffs indicates that Salvadorans frequently are not allowed to exercise that right until *after* they have signed the forms. In this situation the "right to consult with counsel" which attaches after the damage is done is no right at all.

■ The Court therefore concludes that plaintiffs have a strong likelihood of success on the merits of their claim that they are entitled to oral notice of the right to counsel prior to any request to sign a voluntary departure form. Defendants do not argue that such a requirement would in any way impose a burden, and during the hearing on this motion Chief Counsel for the INS acknowledged that it would not be difficult to accede to this request.

### 2. Restrictions on Counsel's Ability to Locate and Act on Behalf of Class Members.

The difficulties encountered by counsel across the country in attempting to represent and gain access to their Salvadoran clients have already been discussed. Because of the rapidity with which the voluntary departure process occurs, it is often physically impossible to file the notice of appearance required by INS regulations before the prospective client is removed from the country. Accordingly, plaintiffs seek an order requiring the INS to accept an oral notice of appearance if counsel represents that formal notice is forthcoming.

Defendants are understandably concerned that, should plaintiffs' request be granted, counsel will be able to revoke the voluntary departure agreements of entire groups of Salvadorans with whom an attorney-client relationship has never been established. The Court believes that these conflicting interests can be reconciled, however. At oral argument Chief Counsel for the INS agreed that it would be possible for the INS to set up a type of "Information Processing Center" in each area from which class members are transported back to El Salvador. Counsel suggested that the INS keep a daily record of Salvadorans due to leave the country in the next 24 hours. Interested attorneys would then call these centers to determine if a client or specifically identified prospective client is about to be returned to El Salvador. If the answer is in the affirmative, counsel would be permitted access to the person prior to departure, regardless of whether a Form G–28 has been entered.

■ Plaintiffs' request will therefore be modified as just described, because the Court finds a strong likelihood of success on the merits but believes that some adjustment in the balance of hardships is necessary.[39] This compromise will not allow

---

38. At oral argument Chief Counsel for the INS noted that he opposes a full-scale *Miranda* warning and the notice regarding political asylum discussed above, but agreed that the INS should not interfere with the alien's right to contact counsel or relatives prior to agreeing to depart voluntarily.

Plaintiffs' claims do not require a decision on whether an alien has a constitutional right to counsel prior to a custodial interrogation. That issue is currently before another judge in this district. *See Vallejo v. Sureck*, No. CV 78–1912 (C.D.Cal.).

39. The mandatory nature of the relief granted is due to the INS Chief Counsel's representation to the Court that his client could easily implement such a procedure. The Court recognizes that such relief might otherwise be outside the scope of a preliminary injunction. In order to further ensure a plan acceptable to defendants, the Court in its Order Dated April 30, 1982 requested defendants to draw up the details of this proposal and submit it to the Court for approval. The Court has reviewed defendants' submission and has adopted the proposal with the modifications suggested by plaintiffs. *See infra* Part VII.

counsel to revoke the voluntary departure agreement of a client for whom no Form G–28 has been entered, but will at least allow counsel the opportunity to inform the client that the agreement is revocable.

 Plaintiffs also request an order requiring the INS to recognize the authority of counsel to revoke voluntary departure agreements after a Form G–28 is filed.[40] In their opposing papers defendants apparently concede that an attorney should be able to revoke a voluntary departure agreement on behalf of a client, but the evidence before the Court indicates that such efforts may be ignored. The Court finds that plaintiffs have a strong likelihood of success on the merits of this claim. *See* 8 C.F.R. § 292.5(a); *cf. Mendez v. INS*, 563 F.2d 956, 958–59 & n.1 (9th Cir. 1977) (right to counsel is meaningless if alien can be deported without any notice to counsel). Defendants have not argued that the requested order would in any way impose a burden. The Court therefore concludes that preliminary injunctive relief is warranted.

D. *District Director Adjudication of Asylum Applications*

Plaintiffs ask the Court to enjoin defendants from commencing deportation hearings against any class member who requests the right to apply for political asylum prior to the issuance of an order to show cause, until such person receives an adjudication of the asylum application from an INS district director. Under 8 C.F.R. § 208.3, asylum applications are to be made to an INS district director unless an order to show cause signifying the commencement of deportation hearings has been issued. After service of an order to show cause, the application must be made to the immigration judge. *Id.* § 208.1. Plaintiffs contend, and defendants concede, that under current INS

policy an asylum request made prior to service of the order to show cause will be heard by an immigration judge during deportation proceedings if service occurs after the request. The order sought by plaintiffs would stay the actual commencement of the deportation hearing (as distinguished from the issuance of the order to show cause) until the alien requesting asylum is allowed to apply to an INS district director and the director's evaluation is completed.

Plaintiffs assert that the net effects of defendants' practice are (1) to require class members to undergo the rigors of deportation proceedings when the need for such proceedings would be obviated by a favorable district director decision; (2) to deprive class members of the right to district director consideration of their asylum claims; and (3) to prevent indigent class members from voluntarily departing the United States.

 At this juncture the Court is not satisfied that plaintiffs have shown the "irreparable injury" necessary for preliminary relief. For class members whose asylum applications are granted by the immigration judge, the "rigors of deportation proceedings" have proved well worth the effort. The effect and duration of the grant of asylum are the same whether given by a district director or an immigration judge. *See* 1 C. Gordon & H. Rosenfield, Immigration Law & Procedure § 2.24Af(6)–(8) (1982).

For those whose applications are denied by the immigration judge, the loss of district director consideration may make little difference. Although INS regulations specifically allow for renewal of applications denied by the district director in front of the immigration judge, thereby providing a "second bite," *see* 8 C.F.R. § 208.9, the immigration judge may rely on the advisory

**40.** After the Court granted the preliminary injunction on April 30, 1982, plaintiffs requested "clarification" of this portion of the Order. Plaintiffs suggested that such clarification take the form of an order requiring the INS to recognize telephonic revocations by counsel of voluntary departure agreements, subject to confirmation that counsel has filed a Form G–28 in the INS facility nearest to the attorney's place of business. Plaintiffs' proposed preliminary injunction order did not contain such a provision, and the Court believes that the order requiring the INS to allow counsel a reasonable opportunity to gain access to Salvadorans prior to departure adequately addresses plaintiffs' concerns.

opinion issued by the State Department at the earlier stage unless circumstances have "materially changed." *Id.* § 208.10(b). Indeed, in arguing for this form of relief counsel for plaintiffs pointed out that the defendants would suffer no "net loss in time" by allowing district director consideration, because the immigration judge's decision would usually follow that of the district director.

Plaintiffs argue additionally that consideration of asylum applications by the district director occurs in a non-adversarial setting in which the applicants are provided "affirmative assistance" in presenting their claims. *See* Plaintiffs' Exhibit 46. During a deportation hearing the INS may present evidence contradicting the grounds for asylum set forth by the applicant. 8 C.F.R. § 208.10(c) & (d). Even though the latter adversarial setting may not be the ideal environment in which to present an asylum claim, the Court cannot conclude on the basis of the evidence submitted by plaintiffs that the district directors actually provide an atmosphere so encouraging that its deprivation amounts to an irreparable injury.

Finally, plaintiffs argue that the institution of deportation hearings against asylum applicants deprives indigent class members of the opportunity to voluntarily depart. Put another way, voluntary departure at government expense is not available after the issuance of an order to show cause. *See* 8 U.S.C. § 1252(b). However, voluntary departure at government expense is far from an absolute right. *See United States v. Barajas-Guillen*, 632 F.2d 749, 753–54 (9th Cir. 1980). For indigent class members the challenged restriction is a handicap, but plaintiffs have not shown it to be one which rises to the level of an "irreparable injury" as that term is used in the test for injunctive relief.

The most that can be said for the effect of defendants' practice on plaintiff class members is that it requires the alien who wishes to apply for political asylum to risk deportation and its accompanying penalties if asylum is denied. *See* 2 C. Gordon & H.

Rosenfield, *supra*, § 7.2a; 8 U.S.C. § 1326. But other forms of relief, such as withholding of deportation, suspension of deportation, or voluntary departure at the alien's expense are still available during and after deportation proceedings. *See* 8 C.F.R. §§ 242.17, 243.4, 244.1; 8 U.S.C. §§ 1105a, 1253(h). Further, the alien who applies to the district director for asylum is not guaranteed voluntary departure and may still have to undergo a deportation hearing if the district director chooses to institute proceedings. 8 C.F.R. § 208.8(f)(4).

In sum, the Court cannot issue a preliminary order requiring defendants to process asylum applications through the district directors in the absence of a showing of irreparable injury to plaintiffs. Plaintiffs' showing that some injury will inure is not sufficient for relief at this stage. It should be emphasized, however, that this ruling is not a final determination on the merits of plaintiffs' claim that the agency has created two jurisdictions for asylum applications and is bound by its own regulations.

## E. *Rights of Incarcerated Class Members*

Plaintiffs' remaining claims for relief concern various conditions imposed on class members incarcerated in INS facilities. Specifically, plaintiffs seek an order allowing class members to have written materials other than the New Testament, extending the hours during which counsel and paralegals may have access to the class members, increasing the number of telephones available at INS facilities, allowing class members to be interviewed by paralegals, and preventing the solitary confinement of any class member for more than 24 hours unless defendants provide notice of the charges, an opportunity to be heard, and a written statement of the reasons for the punishment.

In their opposing papers defendants argued that aliens are not entitled to the same rights as prisoners and contended that the challenged restrictions are reasonable. But at oral argument Chief Counsel for the INS stated that the reasons for the restrictions "paled in comparison" to the hardship

which such rules impose on incarcerated aliens. The Court agrees with counsel's characterization of the balance of hardships and, in light of defendants' apparent change of position, will discuss these issues very briefly.

Because Salvadorans are incarcerated for only a short period prior to their departure, they have limited time in which to learn about and exercise their rights. *See* Defendants' Exhibit K ¶ 8 (estimating that average stay in El Centro facility is nine days). Those aliens who have agreed to voluntarily depart without full knowledge of their rights may thus suffer irreparable injury in the form of removal to El Salvador if they are not permitted greater access to counsel and legal information. Those class members who opt for deportation proceedings and remain incarcerated during the pendency of those proceedings may suffer irreparable injury if they are denied the full and effective assistance of counsel prior to the entry of a deportation order. *See Mendez v. INS*, 563 F.2d at 958–59; 8 U.S.C. § 1252(b). That incarcerated class members will also suffer irreparable injury from arbitrary solitary confinement which deprives them of their liberty is readily apparent. *See Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974).

Turning to the merits of these claims, in a number of decisions involving conditions in prison facilities the Supreme Court and lower courts have overturned the types of restrictions challenged here. *See, e.g., Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (access to courts and legal information is fundamental right); *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (restrictions on mail and access to paralegals held unconstitutional); *Rutherford v. Pitchess*, 457 F.Supp. 104, 115 (C.D.Cal.1978) (reasonable number of telephones must be available to prisoners). Although the Supreme Court has not decided these issues as applied to incarcerated aliens, the same results seem likely. Both prisoners and aliens have "diminished" constitutional rights but both are entitled to minimum due process.

*See Wong Yang Sung v. McGrath*, 339 U.S. at 49–50, 70 S.Ct. at 453–54 (1950); *Yamataya v. Fisher*, 189 U.S. 86, 101, 23 S.Ct. 611, 614, 47 L.Ed. 721 (1903); *Nunez v. Boldin*, slip. op. at 4–7.

 Behind these cases is the notion that incarcerated persons, though most in need of an opportunity to be heard, are least able to learn about their rights. Accordingly, "[r]egulations and practices that unjustifiably obstruct the ability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. at 419, 94 S.Ct. at 1814. Only those regulations which are reasonably related to the maintenance of institutional security and the preservation of internal order and discipline may be imposed. *See Bell v. Wolfish*, 441 U.S. 520, 538–39, 99 S.Ct. 1861, 1873–74, 60 L.Ed.2d 447 (1979).

 Applying these standards to the challenged restrictions, the ban on written materials, particularly written materials explaining the legal rights of aliens, must fall. The potential use of writing materials to clog toilets and other drains can clearly be avoided through other means. *See Nunez v. Boldin*, slip. op. at 6.

With regard to the limited visiting hours, the Court finds that the restrictions at the El Centro facility are unreasonable. Defendants have on occasion managed to find a way to allow counsel to make evening visits. *See* Defendants' Exhibit K ¶ 10. Because of the remoteness of El Centro, the failure to allow routine evening visits imposes a substantial burden on the detainees' right of access to the courts. *Nunez v. Boldin*, slip. op. at 5.

The restrictions on visiting hours at the Pasadena and Los Angeles facilities are less onerous than in El Centro. In view of the proximity of these facilities to several attorneys in the area, the Court cannot say based on the present record that access has been unreasonably limited.

Plaintiffs' claim for additional telephones at El Centro has become moot due to de-

fendants' representation that additional telephones will be installed shortly. Nor does the Court believe that the limited access to telephones at the Los Angeles and Pasadena facilities justifies mandatory relief at this stage of the proceedings, because at least some telephones are available. However, the complete lack of telephones available for use by detainees at the Chula Vista facility remains unexplained by defendants and impermissibly burdens the detainees' ability to contact counsel and relatives.

The absolute ban on the ability of paralegals to interview detainees also constitutes an impermissible burden on the right of access to the courts and counsel. In defendants' view, this ban is necessary because of the limited staff and space available at INS facilities. *See* Defendants' Exhibit J ¶ 9. However, without some showing that the prospective interviewers pose a threat to institutional security or unduly burden the process of screening visitors, such absolute bans are invalid. *See Procunier v. Martinez*, 416 U.S. at 420, 94 S.Ct. at 1814; *Nunez v. Boldin*, slip. op. at 6.

The procedures governing solitary confinement of detainees must also be invalidated. At a minimum, defendants must accord notice of the charges, an opportunity to be heard, and a written statement of the reasons for the decision before taking away the liberty even of incarcerated persons. *See Wolff v. McDonnell, supra.*[41]

It thus appears that plaintiffs have a strong likelihood of success on all of their detention claims, with the exceptions just noted. As defendants have conceded, the balance of hardships is undeniably in plain-

tiffs' favor. Giving due regard to the principle of "mutual accommodation between institutional needs and objectives and the provisions of the Constitution," the Court believes that a preliminary order enjoining the above restrictions is appropriate. *Wolff v. McDonnell*, 418 U.S. at 556, 94 S.Ct. at 2974.

## VII. CONCLUSION

The plight of Salvadorans taken into custody by the INS clearly calls for immediate action. At the beginning of the April 16, 1982 hearing on this matter the Court was hopeful that the parties would be able to reach a settlement regarding most, if not all, of the issues raised herein. The Court granted an open-ended recess in order to give counsel for the parties as much time as they might require to reach an agreement. Unfortunately, the hours of negotiation proved fruitless. The Court agrees with the defendants that the problems of Salvadoran aliens lie within the province of the Immigration Service, but in the absence of any voluntary change in the foregoing practices and procedures, it is incumbent upon this Court to resolve plaintiffs' claims.

 Having concluded that plaintiff class members may suffer irreparable injury if preliminary relief is denied, that Plaintiffs have a strong likelihood of prevailing on the merits of their claims, that the balance of hardships tips in favor of Plaintiffs, and that granting the injunction is in the public interest, IT IS HEREBY ORDERED that the Preliminary Injunction issued by this Court on April 30, 1982 shall remain in force and effect;[42] and it is further OR-

---

**41.** At the April 16, 1982 hearing, plaintiffs agreed that defendants would continue to operate under the present procedures governing solitary confinement so long as the period of confinement does not exceed 24 hours.

**42.** In its Order Dated April 30, 1982 the Court did not require plaintiffs to post security to cover costs or damages under Federal Rule of Civil Procedure 65(c). Defendants now seek a finding as to why bond should not be required.

The question whether and in what amount security should be posted is a matter left to the Court's discretion. *See Winters v. Highlands Ins. Co.*, 569 F.2d 297, 303 (5th Cir. 1978);

*Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) and cases cited therein; *Washington Capitols Basketball Club, Inc. v. Barry*, 304 F.Supp. 1193, 1203 (N.D.Cal.), aff'd, 419 F.2d 472 (9th Cir. 1969). Where, as here, the action is brought by an impecunious class of plaintiffs, preliminary injunctive relief may be granted without any security whatsoever. *See Bartels v. Biernat*, 405 F.Supp. 1012, 1019 (E.D. Wis.1975). A strong likelihood of success on the merits similarly negates the need for security. *See Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972). Defendants have argued that the requested notice of the right to apply for political asylum will impose a tremendous fi-

DERED that Defendants, their agents and successors in office, are enjoined as follows during the pendency of this action:

1. Defendants shall not employ threats, misrepresentation, subterfuge or other forms of coercion, or in any other way attempt to persuade or dissuade class members when informing them of the availability of voluntary departure pursuant to 8 U.S.C. § 1252(b).

2. Before informing any member of the plaintiff class of the availability of voluntary departure pursuant to 8 U.S.C. § 1252(b), Defendants shall:

a) Read verbatim to the class member in Spanish and English the oral notice attached hereto as Exhibit A;

b) Provide the class member with a copy of the written notice attached hereto as Exhibit B and a copy of the free legal services list compiled pursuant to 8 C.F.R. § 292a.1 and permit the class member to retain these in his or her possession. If the plaintiff class member indicates that he or she cannot read, the notice attached hereto as Exhibit B shall be read verbatim to the class member in Spanish and English; and

c) Obtain a signed acknowledgement on a separate copy of the notice attached hereto as Exhibit B from the class member showing that the aforesaid notices have been provided.

3. If, after receiving the above notice, the class member informs Defendants that he or she wishes to apply for political asylum and/or a deportation hearing, Defendants shall not advise, encourage, or persuade the class member to change his or her decision.

4. Defendants shall not remove from the United States by way of voluntary departure pursuant to 8 U.S.C. § 1252(b) any class member who has signed a voluntary departure form prior to the service of this Order upon Defendants until such person has executed a new request for voluntary departure after receiving the notice set forth in paragraph 2 of this Order.

5(a) The INS will assign an officer with a published phone number in each of its four regional offices to provide information on Salvadorans detained in the region and departing for El Salvador from that region through the voluntary departure, I-274 process.

(b) Interested relatives and counsel, if they give the person's name to the INS officer, will be informed of this person's location and the date, time, and the place from which he or she is scheduled to leave.

(c) This information may be obtained by calling the designated phone number only during the normal working hours of the region. The above information will be made available at the region as soon as practicable after travel documents have been obtained, but in any event, at least 24 hours prior to actual departure.

(d) If an attorney informs the officer that he or she wishes to communicate with a specifically identified member of the plaintiff class who is scheduled for voluntary departure, and that he or she has not yet been able to do so, Defendants shall not expel the plaintiff class member until counsel has had a reasonable opportunity for such communication.

6. Once a written notice of appearance has been made by an attorney on behalf of any member of the plaintiff class, Defendants shall:

a) Give counsel 24 hours actual advance notice of the date, time, and place of the intended removal before removing the class member from the United States;

b) Permit counsel to rescind an agreement to voluntarily depart on behalf of the class member; and

c) Allow paralegal assistants working under the supervision of counsel to have access to class members even though the paralegals are unaccompanied by counsel.

7. Defendants shall permit detained or incarcerated class members in the Central District of California or in the El Centro or

nancial burden. However, the fiscal impact feared by defendants is largely due to the long-range effects of the notice requirement and is

necessarily speculative. The immediate fiscal impact caused by the printing of the notice forms is relatively negligible.

Chula Vista facilities to receive and possess legal materials explaining United States immigration law and procedure, and any other written materials unless possession of such materials would conflict with the maintenance of institutional security.

8. Defendants shall immediately install or otherwise make available two telephones to class members detained or incarcerated at the Chula Vista facility.

9. Defendants shall allow counsel or paralegals working under the supervision of counsel reasonable access to class members incarcerated at the El Centro facility between the hours of 9:00 a. m. and 9:30 p. m., excluding such time as is necessary for meal and reasonable security procedures.

10. Defendants shall not place any detained or incarcerated class member in solitary confinement for purposes of punishment or discipline for a period exceeding 24 hours except upon good cause shown and unless said class member has been provided:

a) Written notice of the charges in advance of the hearing;

b) An opportunity to appear at a hearing before impartial fact-finders and to present witnesses and documentary evidence at the hearing prior to placement in solitary confinement; and

c) A written statement of the reasons for any decision to discipline the class member.

Defendants may continue to use their present procedures with regard to class members placed in solitary confinement for a period of 24 hours or less.

IT IS FURTHER ORDERED that this Order shall remain in effect pending a hearing on the merits of the claims for permanent injunctive relief or until other order of this Court.

IT IS FURTHER ORDERED that Plaintiffs shall not be required to post security for the payment of costs or damages.

### [EXHIBIT A]

### NOTICE TO BE GIVEN ORALLY IN SPANISH AND ENGLISH

You are being detained by the United States Immigration and Naturalization Service. I am handing you a written Notice that describes your rights. Please read this Notice carefully before deciding whether you wish to agree to be returned voluntarily to El Salvador, demand a deportation hearing, or request political asylum. You must sign a copy of this Notice to show that you have received it. If you cannot read, please tell me and I will read the Notice to you.

### [EXHIBIT B]

### NOTICE OF RIGHTS

[To be printed in Spanish and English]

The Immigration and Naturalization Service is required to provide you with this Notice describing your rights. You must sign below to show that you have received a copy of this Notice. Do not sign anything else until you have read this Notice and understand your rights.

1. RIGHT TO BE REPRESENTED BY AN ATTORNEY

You have the right to be represented by an attorney of your choice at your own expense. If you wish legal advice and cannot afford a lawyer, you may contact one of the lawyers listed on the attached sheet who provide free legal services.

2. RIGHT TO A DEPORTATION HEARING

You have the right to a deportation hearing to determine whether you are illegally in the United States before you can be deported. If you request a deportation hearing, you may be represented at the hearing by an attorney at your own expense. You may be eligible to be released on bail until the time of the deportation hearing.

3. RIGHT TO APPLY FOR POLITICAL ASYLUM

You may be eligible for political asylum if you have reason to believe that you would be persecuted because of your race, religion, nationality, membership in a particular social group, or political opinions if you were returned to El Salvador. If you wish to apply for political asylum, you should so inform the INS agent who gave you this Notice.

4. RIGHT TO REQUEST VOLUNTARY DEPARTURE

If you want to return immediately to El Salvador, you may ask to be allowed to voluntarily depart. By agreeing to voluntarily depart, you give up your right to a deportation hearing and your right to apply for political asylum.

I ACKNOWLEDGE THAT I HAVE RECEIVED A COPY OF THE ABOVE NOTICE.

## APPENDIX A

## ORDER GRANTING PROVISIONAL CLASS CERTIFICATION

Having found that Plaintiffs have fully satisfied the requirements of Federal Rule of Civil Procedure 23, IT IS HEREBY ORDERED:

1. This action shall be maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

2. With respect to Counts 1, 2, 3, 4, and 6, the class shall be comprised of the following persons:

All citizens and nationals of El Salvador eligible to apply for political asylum under 8 U.S.C. § 1158 who have been or will be taken into custody pursuant to 8 U.S.C. § 1357 by agents of the Immigration and Naturalization Service.

3. With respect to Count 8, the class shall be comprised of the following persons:

All citizens and nationals of El Salvador eligible to apply for political asylum under 8 U.S.C. § 1158 who, subsequent to June 2, 1980, requested, or will in the future request, political asylum within the United States prior to being served with an order to show cause pursuant to 8 C.F.R. § 242.1, whose applications for asylum have not or will not be presented to a district director for adjudication in accordance with 8 C.F.R. § 208.8.

4. The class representatives for Count 1 shall be Crosby Wilfredo Orantes-Hernandez, Marta Ester Paniagua-Vides, Dora Alicia Ayala de Castillo, Adelso Salome Flores, Uvaldo Aguilar, Dora Elia Estrada, Juan Francisco Perez-Cruz, Maria Elena Molina, Marta Osorio and Gloria de Flores.

5. The class representatives for Count 2 shall be Crosby Wilfredo Orantes-Hernandez, Uvaldo Aguilar, Marta Ester Paniagua-Vides, Jose Sanchez Flores, Dora Elia Estrada, Juan Francisco Perez-Cruz, Jose Adilman Barahona, Maria Elena Molina, Candido Carcamo Marroquin, Delia Elizabeth Garcia-Quintanilla, Jose Francisco Marroquin-Salvador, Marta Osorio, and Gloria de Flores.

6. The class representatives for Count 3 shall be Marta Osorio, Gloria de Flores, Candido Carcamo Marroquin, and Jose Francisco Marroquin-Salvador.

7. The class representatives for Counts 4 and 6 shall be Candido Carcamo Marroquin and Jose Francisco Marroquin-Salvador.

8. The class representatives for Count 8 shall be Marta Osorio, Gloria de Flores, Dora Elia Estrada, Jose Adilman Barahona, Adelso Salome Flores, and Delia Elizabeth Garcia-Quintanilla.

9. The Court shall retain the power to modify, amend or revoke the class certification throughout the pendency of the action.

DATED: April 30, 1982.